IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

RECEIVED

MAY 1 6 2012

SAB
HTFD  B & FP CLAIM

| | |
|---|---|
| NATIONAL CREDIT SOLUTIONS, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | )  No. CJ-2012-2674 ) |
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, | ) ) ) |
| Defendants. | ) |

CORPORATE LITIGATION
HARTFORD

MAY 1 4 2012

RECEIVED PM

## SUMMONS

To the above-named Defendant:

You have been sued by the above-named plaintiff, and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you, exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.

Unless you answer the petition within the time stated, judgment will be rendered against you with costs of the action.

PATRICIA PRESLEY, Court Clerk

_____, Court Clerk

by_____ Deputy Court Clerk

5-8-12

ATTORNEY FOR PLAINTIFF:
Jason A. Sansone, OBA No. 30913
3680 East I-240 Service Road
Oklahoma City, Oklahoma 73135
Telephone: (405) 778-6637
Facsimile: (405) 619-3631

This summons was served on _____5-8-12_____ (date of service)

_____ (Signature of person serving summons)

YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER
CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY
SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE
FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.

1

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| NATIONAL CREDIT SOLUTIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CJ-2012-2674 |
| | ) | |
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, Jason A. Sansone, hereby certify that on May 9th 2012, I served copies of the summons and a copy of the complaint on the following parties by way of US mail and personal service on the Oklahoma Insurance Commissioner pursuant to Oklahoma Statutes Title 36 § 621.

Travelers Casualty Insurance Company of America
One Tower Square
Hardford, CT 06183

Oklahoma Insurance Commissioner
Five Corporate Plaza
3625 NW 56th, Suite 100
Oklahoma City, OK 73112-4511

5/9/2012

Jason A. Sansone, OBA No. 30913
3680 East I-240 Service Road
Oklahoma City, Oklahoma 73135
Telephone: (405) 778-6637
Facsimile: (405) 619-3631
ATTORNEY FOR PLAINTIFF

1

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

FILED IN THE DISTRICT COURT
OKLAHOMA COUNTY, OKLA.

MAY = 4 2012

PATRICIA PRESLEY, COURT CLERK

by _____
DEPUTY

| | | |
|---|---|---|
| NATIONAL CREDIT SOLUTIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CJ - 2012 - 2674 |
| | ) | |
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

## PETITION FOR DECLARATORY JUDGMENT

Respectfully submitted, Jason A. Sansone, OBA No. 30913
3680 East I-240 Service Rd., Oklahoma City, Oklahoma 73135, Telephone: (405) 778-6637, Facsimile: (405) 619-3631, Attorney for Plaintiff.

The Plaintiff, National Credit Solutions, LLC ("NCS"), for its Petition for Declaratory Judgment against the Defendants, Travelers Casualty and Surety Company of America ("Defendants"), alleges and states:

1. This is a civil action wherein jurisdiction and venue are predicated upon 12 O.S. § 1651, et seq. (Oklahoma's Declaratory Judgment Act), for the purpose of determining a question of actual controversy, as more fully appears herein.

2. The Plaintiff, NCS, is a corporation organized and existing under and by the laws of the State of Oklahoma, and has its principal place of business in Oklahoma County.

3. Upon information and belief, the above-named Defendant is a corporation organized and existing under and by the laws of the State of Connecticut, and has its principal place of business in a state other than Oklahoma.

4. Defendant issued a policy of miscellaneous professional liability insurance, policy No. 105446858, to National Credit Solutions, LLC. The policy provided liability insurance coverage with limits of $1,000,000.00 for each claim, not to exceed $1,000,000.00 for all claims. This policy was issued May 1, 2010 and expired May 1, 2011. True and accurate copies are attached in Exhibit A.

5. NCS elected to extend the reporting period of the aforementioned policy until May 1, 2012. True and accurate copies are attached in Exhibit B.

1

6. Plaintiffs herein are also listed as Defendants in another action in the Eastern District of Virginia, United States Bankruptcy Court, styled *CORLISS MOORE & ASSOCIATES, LLC, solely in its capacity as Liquidating Trustee for the First Lien Term Lenders Liquidating Trust v. CREDIT CONTROL SERVICES, INC. and NATIONAL CREDIT SOLUTIONS LLC*, Case No. 10-30696-DOT ("HWV Lawsuit"). It is alleged in that lawsuit that, from October 2010 until February 2011, NCS damaged the collectable value of Hollywood Video, Inc. and Movie Gallery, Inc.'s accounts receivables. That Petition prays for relief in the amount of $8,400,000. True and accurate copies are attached in Exhibit C.

7. A motion or answer is due in the HWV Lawsuit by May 18, 2012.

8. Defendant's insurance policy was in full effect at all times allegations in the HWV Lawsuit would have occurred.

9. NCS placed a claim with Defendant on April 17, 2012 for insurance coverage in the HWV Lawsuit. True and accurate copies are attached in Exhibit D.

10. Defendant's extended reporting period was in full effect at all times allegations in the HWV Lawsuit would have occurred.

11. Defendant formally acknowledged receipt of NCS's claim on April 18, 2012. True and accurate copies are attached in Exhibits E and F.

12. Defendant declined NCS's claim for coverage under insurance policy No. 105446858, on April 27, 2012. True and accurate copies are attached in Exhibit G.

13. NCS requested Defendant reconsider their position on April 27, 2012.

14. Defendant reaffirmed their declination of coverage on May 2, 2012. True and accurate copies are attached in Exhibit H.

15. Upon information and belief, Defendant justifies their declination of coverage upon section XI(11) of policy endorsement MPL-7113 (11-09), creating a policy exclusion for claims brought by clients of NCS.

16. NCS admits such policy exclusion exists.

17. Upon information and belief, Defendant asserts plaintiffs in the HWV Lawsuit are clients of NCS.

18. NCS has never contracted with Hollywood Video, Inc.

19. NCS has never contracted with Movie Gallery, Inc.

20. NCS has never contracted with First Lien Term Lenders Liquidating Trust.

2

21. NCS contends that the policy issued by Defendant is valid and enforceable.

22. Defendant operates to preclude, in bad faith, coverage for the claims brought by NCS.

23. There exists an actual and justiciable controversy between NCS and the above-named Defendants within the jurisdiction of this Court and involving the rights and liabilities of the parties under a contract of insurance, which controversy may be determined by a judgment of this Court.

WHEREFORE, Plaintiff prays that:

1. This Court determine and adjudicate the rights and liabilities of the parties with respect to the subject contract of insurance.

2. The Court find and declare that the NCS insurance policy is valid and enforceable, and creates a duty for Defendant to provide a proper and timely defense of NCS with regards to the HWV Lawsuit; and

3. This Court award NCS such other and further relief as in law and justice as it may be entitled to receive.

Respectfully submitted,

Jason A. Sansone, OBA No. 30913

3680 East I-240 Service Road

Oklahoma City, Oklahoma 73135

Telephone: (405) 778-6637

Facsimile: (405) 619-3631

ATTORNEY FOR PLAINTIFF

3

# EXHIBIT A

 **TRAVELERS**

**Wrap+**<sup>SM</sup>
*Collection Professionals*
*Miscellaneous Professional Liability*

**DECLARATIONS**                                             **POLICY NO.105446858**

Travelers Casualty and Surety Company of America
Hartford, CT 06183

(A Stock Insurance Company, herein called the Company)

**THE LIABILITY COVERAGES ARE WRITTEN ON A CLAIMS-MADE BASIS. THE LIABILITY COVERAGES COVER ONLY CLAIMS FIRST MADE AGAINST INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY SETTLEMENTS OR JUDGMENTS WILL BE REDUCED BY DEFENSE EXPENSES, AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE RETENTION. THE COMPANY HAS NO DUTY TO DEFEND ANY CLAIM UNLESS DUTY-TO-DEFEND COVERAGE HAS BEEN SPECIFICALLY PROVIDED HEREIN.**

| | |
|---|---|
| **ITEM 1** | **NAMED INSURED:**<br>**National Credit Solutions, LLC**<br><br>**D/B/A:**<br>**NCS of Oklahoma; North American Credit Solutions**<br><br>**Principal Address**<br>**3680 E I-240 Service Road**<br>**Oklahoma City, OK 73135** |
| **ITEM 2** | **POLICY PERIOD:**<br>Inception Date:May 1, 2010        Expiration Date:May 1, 2011<br>12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1. |
| **ITEM 3** | **ALL NOTICES OF CLAIMS OR LOSS TO THE COMPANY MUST BE ADDRESSED TO:**<br>Travelers Bond & Financial Products<br>Claim Department, MC9275-NB03F<br>385 Washington Street<br>St. Paul, MN  55102<br><br>Email:  BFPclaims@travelers.com<br><br>Fax:  888-460-6622 |
| **ITEM 4** | **COVERAGE INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:**<br><br>☒ **MPL** |

MPL-2001ACA (11-09)                                             Page 1 of 3

| ITEM 5 | Only those coverage features marked "☒ Applicable" are included in this policy. |
|---|---|

<div style="border:1px solid">

**Miscellaneous Professional Liability**

**Limits of Liability:** $1,000,000.00 for each Claim; not to exceed
$1,000,000.00 for all Claims

**Additional Defense
Coverage:** ☐ Applicable   ☒ Not Applicable

**Additional Defense
Limit of Liability:**   for all Claims

**Retention:**   $7,500.00 for each Claim

**Prior and Pending
Proceeding Date:** 04/17/2009

**Continuity Date:** 04/17/2009

**Professional Services:**
Debt Collection, Collection of Owned Debt

</div>

| ITEM 6 | **PREMIUM FOR THE POLICY PERIOD:**<br>    $5,038.00 Policy Premium<br><br>    $0.00 Annual Installment Premium |
|---|---|
| ITEM 7 | **TYPE OF LIABILITY COVERAGE:**<br><br>☐ Reimbursement<br><br>☒ Duty-to-Defend<br><br>Only the type of liability coverage marked "☒" is included in this policy. |
| ITEM 8 | **LIABILITY COVERAGE EXTENDED REPORTING PERIOD:**<br><br>Additional Premium Percentage:   75.00 %<br><br>Additional Months:   12<br><br>(If exercised in accordance with Section III. CONDITIONS O. EXTENDED REPORTING PERIOD of the Liability Coverage Terms and Conditions) |

| ITEM 9 | LIABILITY COVERAGE RUN-OFF EXTENDED REPORTING PERIOD: |
|---|---|
| | Additional Premium Percentage:          NA |
| | Additional Months:          NA |
| | (If exercised in accordance with Section III. CONDITIONS K. CHANGE OF CONTROL of the Liability Coverage Terms and Conditions) |
| ITEM 10 | ANNUAL REINSTATEMENT OF THE LIABILITY COVERAGE LIMIT OF LIABILITY: |
| | ☐ Applicable |
| | ☒ Not Applicable |
| | Only those coverage features marked "☒ Applicable" are included in this policy. |
| ITEM 11 | FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE: MPL-2001ACA-1109; LIA-3001-0705; LIA-5035-0108; LIA-7016-0705; LIA-7182-1207; MPL-3001-0705; MPL-4008-0705; MPL-7112-1208; MPL-7113-1109 |

The Declarations, the **Application**, the Liability Coverage Terms and Conditions, this **Liability Coverage**, and any endorsements attached thereto, constitute the entire agreement between the Company and the Insured.

Countersigned By
(where applicable)

 **TRAVELERS** **Wrap+** ᴿᴹ

## Liability Coverage Terms and Conditions

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.
PLEASE READ ALL TERMS CAREFULLY.**

**CONSIDERATION CLAUSE**

**IN CONSIDERATION** of the payment of the premium stated in the Declarations, in reliance on the statements in the **Application**, subject to the Declarations, and pursuant to all the terms, exclusions, conditions and limitations of this **Liability Policy**, the Company and the **Insured** agree as follows:

**I.    GENERAL**

These Liability Coverage Terms and Conditions apply to all **Liability Coverages**. Unless otherwise stated to the contrary, the terms and conditions of each **Liability Coverage** apply only to that particular **Liability Coverage**. If any provision in these Liability Coverage Terms and Conditions is inconsistent or in conflict with the terms and conditions of any particular **Liability Coverage**, such **Liability Coverage's** terms, conditions, and limitations shall control for purposes of that **Liability Coverage**.

**II.   DEFINITIONS**

Wherever appearing in this **Liability Policy**, the following words and phrases appearing in bold type shall have the meanings set forth in this Section II. DEFINITIONS:

A.    **"Additional Defense Limit of Liability"** means the amount set forth in ITEM 5 of the Declarations for each applicable **Liability Coverage**. If *"Not Applicable"* is shown as the amount of any **Liability Coverage's Additional Defense Limit of Liability**, then any reference to the **Additional Defense Limit of Liability** shall be deemed to be deleted from such **Liability Coverage** .

B.    **"Annual Reinstatement of the Liability Coverage Limit of Liability"** means, if included in ITEM 10 of the Declarations, the reinstatement of each applicable **Liability Coverage Limit of Liability** or, if applicable, the **Liability Coverage Shared Limit of Liability** for each applicable **Liability Coverage** for each **Policy Year** during the **Policy Period**.

C.    **"Application"** means the Application deemed to be attached to and forming a part of this **Liability Policy**, including any materials submitted and statements made in connection therewith. If the **Application** uses terms or phrases that differ from the terms defined in this **Liability Policy**, no inconsistency between any term or phrase used in the **Application** and any term defined in this **Liability Policy** will waive or change any of the terms, conditions and limitations of this **Liability Policy**.

D.    **"Change of Control"** means:

1.    the acquisition of the **Named Insured**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Named Insured** into or with another entity such that the **Named Insured** is not the surviving entity;

2.    the appointment of a trustee, including an interim trustee, a receiver, conservator, liquidator or rehabilitator, or any similar official, for or with respect to the **Named Insured**; provided, that, the **Named Insured** operating as a "debtor in possession" does not in and of itself constitute a Change of Control as defined in this section; or

3.    the obtaining by any person, entity or affiliated group of persons or entities the right to elect, appoint or designate more than fifty percent (50%) of the board of directors, board of trustees, board of managers, or functional equivalent thereof or to exercise a majority control of the board of directors, board of trustees, board of managers, or a functional equivalent thereof of the **Named Insured**.

E.    **"Claim"** shall have the meaning set forth in the applicable **Liability Coverage** .

F.     "**Defense Expenses**" means reasonable and necessary legal fees and expenses incurred by the Company or the **Insured**, with the Company's consent, in the investigation, defense, settlement and appeal of a **Claim**, including but not limited to, cost of expert consultants and witnesses, premiums for appeal, injunction, attachment or supersedeas bonds (without the obligation to furnish such bonds) regarding such **Claim**; provided, that **Defense Expenses** shall not include the salaries, wages, benefits or overhead of, or paid to, any **Insured** or any employee thereof.

G.     "**Executive Officer**" shall have the meaning set forth in the applicable **Liability Coverage**.

H.     "**Financial Insolvency**" means, with respect to the **Insured Organization**, the appointment of a receiver, conservator, liquidator, trustee, or similar official; or the inability of the **Insured Organization** financially or under applicable law to indemnify the **Insured Persons**.

I.     "**Foreign Parent Corporation**" means any entity incorporated outside the United States, which owns more than fifty percent (50%) of the outstanding securities or voting rights representing the right to vote for the election of, or to appoint the **Named Insured's** board of directors, board of trustees or board of managers, or to exercise a majority control of the board of directors, board of trustees or board of managers of the **Named Insured**.

J.     "**Insured**" shall have the meaning set forth in the applicable **Liability Coverage**.

K.     "**Insured Organization**" shall have the meaning set forth in the applicable **Liability Coverage**.

L.     "**Insured Person**" shall have the meaning set forth in the applicable **Liability Coverage**.

M.     "**Liability Coverage**" means, individually or collectively, the **Liability Coverages** that have been purchased, as indicated in ITEM 4 of the Declarations.

N.     "**Liability Coverage Limit of Liability**" means the amount set forth in ITEM 5 of the Declarations for each applicable **Liability Coverage**.

O.     "**Liability Coverage Shared Limit of Liability**" means the amount set forth in ITEM 12 of the Declarations. If "*Not Applicable*" is shown in ITEM 12 of the Declarations or ITEM 4 of the Declarations indicates that only one **Liability Coverage** is included in this **Liability Policy**, any reference to either the **Liability Coverage Shared Limit of Liability** or ITEM 12 of the Declarations shall be deemed to be deleted from this **Liability Policy**.

P.     "**Liability Policy**" means, collectively, the Declarations, the **Application**, the Liability Coverage Terms and Conditions, each purchased **Liability Coverage**, and any endorsements attached thereto.

Q.     "**LLC Manager**" means any natural person who was, is or becomes a manager, member of the board of managers, or a functionally equivalent executive of an **Insured Organization** that is a limited liability company.

R.     "**Loss**" shall have the meaning set forth in the applicable **Liability Coverage**.

S.     "**Named Insured**" means the entity named in ITEM 1 of the Declarations.

T.     "**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations. In no event shall the **Policy Period** continue past the effective date of cancellation or termination of this **Liability Policy**.

U.     "**Policy Year**" means:

       1.      the period of one year following the Inception Date set forth in ITEM 2 of the Declarations or any anniversary thereof;

       2.      if the time between the Inception Date set forth in ITEM 2 of the Declarations or any anniversary thereof and the effective date of cancellation or termination of this **Liability Policy** is less than one year, then such lesser period;

       3.      if a **Liability Coverage** is added to this **Liability Policy** after the Inception Date set forth in ITEM 2 and the time between the inception date of such **Liability Coverage** and any anniversary of this **Liability Policy** is less than one year, then such lesser period with respect to such **Liability Coverage**; and

4.     if a **Liability Coverage** is added to this **Liability Policy** after the Inception Date set forth in ITEM 2 and the time between the inception date of such **Liability Coverage** and the effective date or cancellation or termination of this **Liability Policy**, or such **Liability Coverage**, is less than one year, then such lesser period with respect to such **Liability Coverage**.

V.     "**Pollution**" means any actual, alleged or threatened exposure to, or generation, storage, transportation, discharge, emission, release, dispersal, escape, treatment, removal or disposal of any smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants (collectively "Toxins"); or any regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any such Toxins, or any action taken in contemplation or anticipation of any such regulation, order, direction or request.

W.     "**Potential Claim**" means any **Wrongful Act** that may subsequently give rise to a **Claim**.

X.     "**Related Wrongful Act**" means **Wrongful Acts** which are logically or causally connected by reason of any fact, circumstance, situation, transaction, casualty, event or decision.

Y.     "**Subsidiary**" shall have the meaning set forth in the applicable **Liability Coverage**.

Z.     "**Wage and Hour Law**" means any federal, state, or local law or regulation governing or related to the payment of wages including the payment of overtime, on-call time or minimum wages, or the classification of employees for the purpose of determining employees' eligibility for comp ensation under such law(s).

AA.    "**Wrongful Act**" shall have the meaning set forth in the applicable **Liability Coverage**.

### III.   CONDITIONS

### A.   TERRITORY

This **Liability Policy** applies to **Claims** made or **Wrongful Acts** occurring anywhere in the world.

### B.   RETENTION

The **Insured** shall bear uninsured at its own risk the amount of any applicable Retention.

If any **Claim** gives rise to coverage under a single **Liability Coverage**, the Company shall have no obligation to pay **Loss**, including **Defense Expenses**, until the applicable Retention amount set forth in ITEM 5 of the Declarations has been paid by the **Insured**.

If any **Claim** is subject to different Retentions under a single **Liability Coverage**, the applicable Retentions will be applied separately to each part of such **Claim**, but the sum of such Retentions will not exceed the largest applicable Retention under such **Liability Coverage**.

If any **Claim** gives rise to coverage under two or more **Liability Coverages**, the Company shall have no obligation to pay **Loss**, including **Defense Expenses**, until the largest Retention that is applicable to such **Claim** under such **Liability Coverages** has been paid by the **Insured**.

No Retention shall apply to an **Insured Person** if indemnification by the **Insured Organization** is not permitted by law or if the **Insured Organization** is unable to make such indemnification solely by reason of its **Financial Insolvency**. The **Insured Organization** will be conclusively deemed to have indemnified all **Insured Persons** to the extent that the **Insured Organization** is permitted or required to indemnify them pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Insured Organization**.

The Company may, at its sole discretion, pay all or part of the Retention amount on behalf of any **Insured**, and in such event, the **Insureds** agree to repay the Company any amounts so paid.

### C.   LIMITS OF LIABILITY

1.     Liability Coverage Limit of Liability

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured**'s legal obligation with regard thereto arises or is

established, and further subject to any applicable **Liability Coverage Shared Limit of Liability** or **Annual Reinstatement of the Liability Coverage Limit of Liability**:

        a.    the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all **Claims** under each applicable **Liability Coverage** shall not exceed the remaining **Liability Coverage Limit of Liability** stated in ITEM 5 of the **Declarations** for each applicable **Liability Coverage**; and

        b.    in the event that a **Claim** triggers more than one **Liability Coverage**, the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for any such **Claim** shall not exceed the sum of the remaining **Liability Coverage Limits of Liability** of the applicable **Liability Coverages**.

    2.    <u>Liability Coverage Shared Limit of Liability</u>

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established; and further subject to any applicable **Annual Reinstatement of the Liability Coverage Limit of Liability**, if ITEM 4 of the Declarations indicates that more than one **Liability Coverage** has been purchased and a **Liability Coverage Shared Limit of Liability** is shown in ITEM 12 of the Declarations:

        a.    the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all **Claims** under all **Liability Coverages** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, shall not exceed the remaining **Liability Coverage Shared Limit of Liability**; and

        b.    if the **Liability Coverage Shared Limit of Liability** is exhausted by the payment of amounts covered under any **Liability Coverage** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, the premium for all **Liability Coverages** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, shall be fully earned, all obligations of the Company under all **Liability Coverages** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, shall be completely fulfilled and exhausted, including any duty to defend, and the Company shall have no further obligations of any kind or nature whatsoever under any **Liability Coverage** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations.

    3.    <u>Annual Reinstatement of the Liability Coverage Limit of Liability</u>

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established, if ITEM 10 of the Declarations includes an **Annual Reinstatement of the Liability Coverage Limit of Liability**:

        a.    the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all **Claims** made during each **Policy Year** shall not exceed the remaining **Liability Coverage Limit of Liability** stated in ITEM 5 of the Declarations for each applicable **Liability Coverage** or, if applicable, the remaining **Liability Coverage Shared Limit of Liability**; and

        b.    with regard to the Extended Reporting Period or the Run-Off Extended Reporting Period, if applicable, the Company's maximum limit of liability for all **Claims** made during the Extended Reporting Period or the Run-Off Extended Reporting Period shall not exceed the remaining **Liability Coverage Limit of Liability** or, if applicable, the **Liability Coverage Shared Limit of Liability** for the last **Policy Year** in effect at the time of the termination or cancellation of the **Liability Coverage** or the **Change of Control**.

    4.    <u>Other Provisions</u>

Payment of **Defense Expenses** shall reduce and may exhaust all applicable limits of liability. In the event the amount of **Loss** exceeds the portion of the applicable limit of liability remaining after prior payments of **Loss**, the Company's liability shall not exceed the remaining amount of the applicable limit of liability. In no event shall the Company be obligated to make any payment for **Loss**, including **Defense Expenses**, with regard to a **Claim** after the applicable limit of liability has been exhausted by payment or tender of payment of **Loss**.

If a **Liability Coverage Limit of Liability** is exhausted by the payment of amounts covered under such **Liability Coverage**, the premium for such **Liability Coverage** shall be fully earned, all obligations of the Company under such **Liability Coverage** shall be completely fulfilled and exhausted, including any duty to defend, and the Company shall have no further obligations of any kind or nature whatsoever under such **Liability Coverage**.

D.    ADDITIONAL DEFENSE COVERAGE

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established, if ITEM 5 of the Declarations indicates that any **Liability Coverage** includes Additional Defense Coverage, **Defense Expenses** incurred by the Company or the **Insured**, with the Company's consent, in the defense of any **Claim** made during the **Policy Period** under any such **Liability Coverage** shall apply first to and reduce the **Additional Defense Limit of Liability**. The **Additional Defense Limit of Liability** shall be in addition to, and not part of, such **Liability Coverage's** applicable **Liability Coverage Limit of Liability** or **Liability Coverage Shared Limit of Liability**, if applicable. The **Additional Defense Limit of Liability** is applicable to **Defense Expenses** only. If the **Annual Reinstatement of the Liability Coverage Limit of Liability** is applicable, the **Additional Defense Limit of Liability** shall be reinstated for each **Policy Year**.

Upon exhaustion of the **Additional Defense Limit of Liability**:

        1.        **Defense Expenses** incurred by the Company or the **Insured**, with the Company's consent, in the defense of a **Claim** are part of and not in addition to any applicable limit of liability; and

        2.        payment by the Company or the **Insured**, with the Company's consent, of **Defense Expenses** reduces any applicable limit of liability.

E.    CLAIM DEFENSE

        1.        If Duty-to-Defend coverage is provided with respect to this **Liability Policy** as indicated in ITEM 7 of the Declarations:

                a.        the Company shall have the right and duty to defend any **Claim** covered by a **Liability Coverage**, even if the allegations are groundless, false or fraudulent, including the right to select defense counsel with respect to such **Claim**; provided, that the Company shall not be obligated to defend or to continue to defend any **Claim** after the applicable limit of liability has been exhausted by payment of **Loss**; and

                b.        the **Insured** shall cooperate with the Company and, upon the Company's request, assist in making settlements and in the defense of **Claims** and in enforcing rights of contribution or indemnity against any person or entity which may be liable to the **Insured** because of an act or omission insured under such **Liability Coverage**, shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

        2.        If Reimbursement coverage is provided with respect to this **Liability Policy** as indicated in ITEM 7 of the Declarations:

                a.        the Company shall have no duty to defend any **Claim** covered by a **Liability Coverage**. It shall be the duty of the **Insured** to defend such **Claims**; and the Company shall have the right to participate with the **Insured** in the investigation, defense and settlement, including but not limited to the negotiation of a settlement of any **Claim** that appears reasonably likely to be covered in whole or in part by such **Liability Coverage** and the selection of appropriate defense counsel; and

                b.        upon written request, the Company will advance **Defense Expenses** with respect to such **Claim**. Such advanced payments by the Company shall be repaid to the Company by the **Insureds** severally according to their respective interests in the event and to the extent that the **Insureds** shall not be entitled to payment of such **Defense Expenses** under such **Liability Coverage**. As a condition of any payment of **Defense Expenses** under this subsection, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of any **Defense Expenses** paid to or on behalf of any **Insured** if it is finally determined that any such **Claim** or portion of any **Claim** is not covered under such **Liability Coverage**.

F.    INSURED'S DUTIES IN THE EVENT OF A CLAIM

In the event an **Executive Officer** shall become aware that a **Claim** has been made against any **Insured**, the **Insured**, as a condition precedent to any rights under this **Liability Policy**, shall give to the Company written notice of the particulars of such **Claim**, including all facts related to any alleged **Wrongful Act**, the identity of each person allegedly involved in or affected by such **Wrongful Act**, and the dates of the alleged events, as soon as practicable. The **Insured** shall give the Company such information, assistance and cooperation as it may reasonably require.

All notices under this subsection must be sent by mail or prepaid express courier to the address set forth in ITEM 3 of the Declarations and shall be effective upon receipt. The **Insured** shall not voluntarily settle any **Claim**, make any settlement offer, assume or admit any liability or, except at the **Insured's** own cost, voluntarily make any payment, pay or incur any **Defense Expenses**, or assume any obligation or incur any other expense, without the Company's prior written consent, such consent not to be unreasonably withheld. The Company shall not be liable for any settlement, **Defense Expenses**, assumed obligation or admission to which it has not consented.

G.     NOTICE OF POTENTIAL CLAIMS

If an **Insured** becomes aware of a **Potential Claim** and gives the Company written notice of the particulars of such **Potential Claim**, including all facts related to the **Wrongful Act** , the identity of each person allegedly involved in or affected by such **Wrongful Act**, the dates of the alleged events, and the reasons for anticipating a **Claim** , as soon as practicable during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, any **Claim** subsequently made against any **Insured** arising out of such **Wrongful Act** shall be deemed to have been made during the **Policy Period**.

All notices under this subsection must be sent by mail or prepaid express courier to the address set forth in ITEM 3 of the Declarations and shall be effective upon receipt.

H.     RELATED CLAIMS

All **Claims** or **Potential Claims** for **Related Wrongful Acts** shall be considered as a single **Claim** or **Potential Claim**, whichever is applicable, for purposes of this **Liability Policy**. All **Claims** or **Potential Claims** for **Related Wrongful Acts** shall be deemed to have been made at the time the first of such **Claims** or **Potential Claims** for **Related Wrongful Acts** was made whether prior to or during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

I.     SUBROGATION

In the event of payment under this **Liability Policy**, the Company shall be subrogated to all of the **Insured's** rights of recovery against any person or organization to the extent of such payment and the **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall do nothing to prejudice such rights.

J.     RECOVERIES

All recoveries from third parties for payments made under this **Liability Policy** shall be applied, after first deducting the costs and expenses incurred in obtaining such recovery, in the following order of priority:

       1.     first, to the Company to reimburse the Company for any Retention amount it has paid on behalf of any **Insured**;

       2.     second, to the **Insured** to reimburse the **Insured** for the amount it has paid which would have been paid hereunder but for the fact that it is in excess of the applicable limits of liability hereunder;

       3.     third, to the Company to reimburse the Company for the amount paid hereunder; and

       4.     fourth, to the Insured in satisfaction of any applicable Retention;

provided, recoveries do not include any recovery from insurance, suretyship, reinsurance, security or indemnity taken for the Company's benefit.

K.     CHANGE OF CONTROL

If, during the **Policy Period**, a **Change of Control** occurs, coverage shall continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to **Claims** for **Wrongful Acts** committed after such event. No coverage will be available hereunder for **Loss**, including **Defense Expenses**, for any **Claim** based upon, alleging, arising out of, or in any way relating to, directly or indirectly any **Wrongful Act** committed or allegedly committed after such event. After any such event, the **Liability Policy** may not be canceled by the **Named Insured** and the entire premium for the **Liability Policy** will be deemed fully earned.

Upon the occurrence of any **Change of Control**, the **Named Insured** shall have the right to give the Company notice that it desires to purchase a Run-Off Extended Reporting Period for any **Liability Coverage** for the period set forth in ITEM 9 of the Declarations

following the effective date of such **Change of Control**, regarding **Claims** made during such Run-Off Extended Reporting Period against persons or entities who at the effective date of the **Change of Control** are **Insureds**, but only for **Wrongful Acts** occurring wholly prior to such **Change of Control** and which otherwise would be covered by such **Liability Coverage**, subject to the following provisions:

      1.     such Run-Off Extended Reporting Period shall not provide new, additional or renewed limits of liability; and

      2.     the Company's total liability for all **Claims** made during such Run-Off Extended Reporting Period shall be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the **Change of Control**.

The premium due for the Run-Off Extended Reporting Period shall equal the percentage set forth in ITEM 9 of the Declarations of the annualized premium of the applicable **Liability Coverage**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Period** prior to the **Change of Control**. The entire premium for the Run-Off Extended Reporting Period shall be deemed fully earned at the commencement of such Run-Off Extended Reporting Period.

The right to elect the Run-Off Extended Reporting Period shall terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company with in thirty (30) days of the **Change of Control**. In the event the Run-Off Extended Reporting Period is purchased, the option to purchase the Extended Reporting Period in Section III. CONDITIONS O. EXTENDED REPORTING PERIOD of these Liability Coverage Terms and Conditions shall terminate. In the event the Run-Off Extended Reporting Period is not purchased, the **Named Insured** will have the right to purchase the Extended Reporting Period under the terms of Section III. CONDITIONS O. EXTENDED REPORTING PERIOD of these Liability Coverage Terms and Conditions.

If, at any time during the **Policy Period**, the **Insured Organization** eliminates or reduces its ownership interest in, or control over a **Subsidiary**, such that it no longer meets the definition of a **Subsidiary**, coverage shall continue for such entity but only with regard to **Claims** for **Wrongful Acts** which occurred wholly during the time that the entity was a **Subsidiary**.

L.     ACQUISITIONS

If, during the **Policy Period**, the **Insured Organization** acquires or forms a **Subsidiary**, this **Liability Policy** will provide coverage for such **Subsidiary** and its respective **Insured Persons**, subject to all other terms and conditions of this **Liability Policy**, provided written notice of such acquisition or formation has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company may require, all within ninety (90) days after the effective date of such formation or acquisition. Coverage for such **Subsidiary** shall not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the Named Insured has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement shall not apply provided that: (1) the assets of the acquired or formed **Subsidiary** do not exceed twenty-five percent (25%) of the total assets of the **Insured Organization** as reflected in the **Insured Organization's** most recent fiscal year-end financial statement; or (2) the acquisition or formation occurs less than ninety (90) days prior to the end of the **Policy Period**.

M.     SPOUSAL AND DOMESTIC PARTNER LIABILITY COVERAGE

This **Liability Policy** will, subject to all of its terms, conditions, and limitations, be extended to apply to **Loss** resulting from a **Claim** made against a person who, at the time the **Claim** is made, is a lawful spouse or a person qualifying as a domestic partner under the provisions of any applicable federal, state or local law (a "Domestic Partner") of an **Insured Person**, but only if and so long as:

      1.     the **Claim** against such spouse or Domestic Partner results from a **Wrongful Act** actually or allegedly committed by the **Insured Person**, to whom the spouse is married, or who is joined with the Domestic Partner; and

      2.     such **Insured Person** and his or her spouse or Domestic Partner are represented by the same counsel in connection with such **Claim**.

No spouse or Domestic Partner of an **Insured Person** will, by reason of this subsection have any greater right to coverage under this **Liability Policy** than the **Insured Person** to whom such spouse is married, or to whom such Domestic Partner is joined.

The Company shall have no obligation to make any payment for **Loss** in connection with any **Claim** against a spouse or Domestic Partner of an **Insured Person** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such spouse or Domestic Partner.

11A-3001 (07-09)                                                   

N.    FOREIGN PARENT CORPORATION COVERAGE

This **Liability Policy** will, subject to all of its terms, conditions, and limitations, be extended to apply coverage for **Defense Expenses** resulting from any **Claim** made against a **Foreign Parent Corporation**, but only if and so long as:

      1.      such **Claim** results from a **Wrongful Act** actually or allegedly committed solely by any **Insured**;

      2.      such **Insured** and the **Foreign Parent Corporation** are represented by the same counsel in connection with such **Claim**; and

      3.      such **Insured** is included as a co-defendant.

No **Foreign Parent Corporation** will, by reason of this subsection, have any greater right to coverage under this **Liability Policy** than any **Insured**.

The Company shall have no obligation to make any payment for **Loss** in connection with any **Claim** against a **Foreign Parent Corporation** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such **Foreign Parent Corporation** or any member of the board of directors, officer, employee, or functional equivalent thereof.

O.    EXTENDED REPORTING PERIOD

At any time prior to or within thirty (30) days after the effective date of termination or cancellation of any **Liability Coverage** for any reason other than nonpayment of premium, the **Named Insured** may give the Company written notice that it desires to purchase an Extended Reporting Period for the period set forth in ITEM 8 of the Declarations following the effective date of such termination or cancellation, regarding **Claims** made during such Extended Reporting Period against persons or entities who at or prior to the effective date of termination or cancellation are **Insureds**, but only for **Wrongful Acts** occurring wholly prior to the effective date of the termination or cancellation and which otherwise would be covered by such **Liability Coverage**, subject to the following provisions:

      1.      such Extended Reporting Period shall not provide a new, additional or renewed limit(s) of liability; and

      2.      the Company's maximum limit of liability for all **Claims** made during such Extended Reporting Period shall be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the termination or cancellation;

The premium due for the Extended Reporting Period shall equal the percentage set forth in ITEM 8 of the Declarations of the annualized premium of the applicable **Liability Coverage**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Year** prior to such termination or cancellation. The entire premium for the Extended Reporting Period shall be deemed to have been fully earned at the commencement of such Extended Reporting Period.

The right to elect the Extended Reporting Period shall terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within thirty (30) days of the effective date of the termination or cancellation.

P.    ALLOCATION

      1.      If Duty-to-Defend coverage is indicated in ITEM 7 of the Declarations and there is a **Claim** under any **Liability Coverage** in which the **Insureds** who are afforded coverage for such **Claim** incur an amount consisting of both **Loss** that is covered by such **Liability Coverage** and also loss that is not covered by such **Liability Coverage** because such **Claim** includes both covered and uncovered matters or covered and uncovered parties, then such covered **Loss** and uncovered loss shall be allocated as follows:

            a.      one hundred percent (100%) of **Defense Expenses** shall be allocated to covered **Loss**; and

            b.      all loss other than **Defense Expense** shall be allocated between covered **Loss** and uncovered loss based upon the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and settlement of the **Claim** by the **Insured Persons**, the **Insured Organization**, and others not insured under such **Liability Coverage**. In making such a determination, the **Insured Organization**, the **Insured Persons** and the Company agree to use their best efforts to determine a fair and proper allocation of all such amounts. In the event that an allocation cannot be agreed to, then the Company shall be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of the applicable **Liability Coverage** and applicable law.

LIA-2001 (07-05)                                                                                                 Page 8 of 11

Notwithstanding the above, if ITEM 4 of the Declarations indicates that Employment Practices Liability or Fiduciary Liability coverage has been purchased, with respect to such **Liability Coverages**, the **Insureds** and the **Company** agree to use their best efforts to determine a fair and proper allocation of all covered **Defense Expenses** and uncovered defense expenses for **Claims** alleging a violation of responsibilities, duties, or obligations imposed under any **Wage and Hour Law**. In the event that an allocation cannot be agreed to, the **Company** shall be obligated to make an interim payment of the amount of **Defense Expenses** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of the applicable **Liability Coverage** and applicable law.

2.   If Reimbursement coverage is indicated in ITEM 7 of the Declarations and there is a **Claim** under any **Liability Coverage** in which the **Insureds** who are afforded coverage for such **Claim** incur an amount consisting of both **Loss** that is covered by such **Liability Coverage** and also loss that is not covered by such **Liability Coverage** because such **Claim** includes both covered and uncovered matters or covered and uncovered parties, the **Insureds** and the **Company** agree to use their best efforts to determine a fair and proper allocation of all such amounts. In making such a determination, the parties shall take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and settlement of the **Claim** by the **Insured Persons**, the **Insured Organization**, and others not insured under the applicable **Liability Coverage**. In the event that an allocation cannot be agreed to, then the **Company** shall be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of the applicable **Liability Coverage** and applicable law.

Q.   CANCELLATION

The **Company** may cancel this **Liability Policy** for failure to pay a premium when due, in which case twenty (20) days written notice shall be given to the **Named Insured**, unless, payment in full is received within twenty (20) days of the **Named Insured's** receipt of such notice of cancellation. The **Company** shall have the right to the premium amount for the portion of the **Policy Period** during which this **Liability Policy** was in effect.

Subject to the provisions set forth in Section III. CONDITIONS K. CHANGE OF CONTROL, the **Named Insured** may cancel any **Liability Coverage** by mailing the **Company** written notice stating when, thereafter, not later than the Expiration Date set forth in ITEM 2 of the Declarations, such cancellation will be effective. In the event the **Named Insured** cancels, the earned premium will be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

The **Company** will not be required to renew this **Liability Policy** upon its expiration. If the **Company** elects not to renew, it will provide to the **Named Insured** written notice to that effect at least thirty (30) days before the Expiration Date set forth in ITEM 2 of the Declarations.

R.   ACTION AGAINST THE COMPANY

No action shall lie against the **Company** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this **Liability Policy**, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial, or by written agreement of the **Insured**, the claimant and the **Company**.

No person or organization shall have any right under this **Liability Policy** to join the **Company** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Company** be impleaded by an **Insured** or said **Insured's** legal representative. Bankruptcy or insolvency of any **Insured** or an **Insured's** estate shall not relieve the **Company** of any of its obligations hereunder.

S.   CHANGES

Only the **Named Insured** is authorized to make changes in the terms of this **Liability Policy** and solely with the **Company's** prior written consent. This **Liability Policy's** terms can be changed, amended or waived only by endorsement issued by the **Company** and made a part of this **Liability Policy**. Notice to any representative of the **Insured** or knowledge possessed by any agent or by any other person shall not effect a waiver or change to any part of this **Liability Policy**, or estop the **Company** from asserting any right under the terms, conditions and limitations of this **Liability Policy**, nor may the terms, conditions and limitations hereunder be waived or changed, except by a written endorsement to this **Liability Policy** issued by the **Company**.

T.   ASSIGNMENT

This **Liability Policy** shall not be assigned or transferred, and any such attempted assignment or transfer shall be void and without effect unless the Company has provided its prior written consent to such assignment or transfer.

U.    REPRESENTATIONS

By acceptance of the terms set forth in this **Liability Policy**, each **Insured** represents and agrees that the statements contained in the **Application**, which is deemed to be attached hereto, incorporated herein, and forming a part hereof, are said **Insured's** agreements and representations, that such representations are material to the Company's acceptance of this risk, that this **Liability Policy** is issued in reliance upon the truth of such representations, and embodies all agreements existing between said **Insured** and the Company or any of its agents.

In the event that any statement or representation in the **Application** is untrue with respect to any **Liability Coverage**, such **Liability Coverage** shall be void and of no effect whatsoever, but only with respect to:

      1.    any **Insured Person** who knew, as of the Inception Date set forth in ITEM 2 of the Declarations, that the statement or representation was untrue;

      2.    any **Insured Organization**, to the extent it indemnifies any such **Insured Person**; and

      3.    any **Insured Organization**, if the person who signed the **Application** knew that the statement or representation was untrue.

Whether an **Insured Person** had such knowledge shall be determined without regard to whether the **Insured Person** actually knew the **Application**, or any other application completed for this **Liability Policy**, contained any such untrue statement or representation.

V.    LIBERALIZATION

If, during the **Policy Period**, the Company is required, by law or by insurance supervisory authorities of the state in which this **Liability Policy** was issued, to make any changes in the form of this **Liability Policy**, by which the insurance afforded by this **Liability Policy** could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance shall inure to the benefit of the **Insured** as of the date the revision or change is approved for general use by the applicable department of insurance.

W.    AUTHORIZATION

By acceptance of the terms herein, the **Named Insured** agrees to act on behalf of all **Insureds** with respect to the payment of premiums, the receiving of any return premiums that may become due hereunder, and the receiving of notices of cancellation, nonrenewal, or change of coverage, and the **Insureds** each agree that they have, individually and collectively, delegated such authority exclusively to the **Named Insured**; provided, that nothing herein shall relieve the **Insureds**, and each of them, from giving any notice to the Company that is required under this **Liability Policy**.

X.    ENTIRE AGREEMENT

The Declarations, the **Application**, the Liability Coverage Terms and Conditions, each **Liability Coverage**, and any endorsements attached thereto, constitute the entire agreement between the Company and the **Insured**.

Y.    HEADINGS

The titles of the various paragraphs of this **Liability Policy** and its endorsements are inserted solely for convenience or reference and are not to be deemed in any way to limit or affect the provision to which they relate.

IN WITNESS WHEREOF, the Company has caused this **Liability Policy** to be signed by its authorized officers at Hartford, CT.


Thomas M. Husabl

Executive Vice President


Wendy C. Sky

Corporate Secretary

ISSUED BY: Travelers Casualty and Surety Company of America        POLICY NO: 105446858

ISSUED TO: National Credit Solutions, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**OKLAHOMA CANCELLATION AND NONRENEWAL**

This endorsement modifies insurance provided under the following if applicable:
**Miscellaneous Professional Liability**

It is agreed that:

1.      The CANCELLATION section of this policy is replaced by the following:

CANCELLATION

The Company may cancel this policy for failure to pay a premium when due, in which case
(          **Twenty**          ) ( 20 ) days (number of days must equal or exceed twenty (20) days) written notice shall be given
to the **Named Insured or Insurance Representative**, unless payment in full is received within twenty (20) days of the **Named
Insured or Insurance Representative**'s receipt of such notice of cancellation.  If the effective date of cancellation falls on a Sunday
or legal holiday, the cancellation date must be extended until the next business day.  The Company shall have the right to the premium
amount for the portion of the **Policy Period** during which this policy was in effect.

Subject to the provisions set forth in Liability Coverage Terms and Conditions Section III. CONDITIONS K. CHANGE OF
CONTROL, if applicable, the **Named Insured or Insurance Representative** may cancel any coverage by mailing the Company
written notice stating when, thereafter, not later than the Expiration Date set forth in ITEM 2 of the Declarations, such cancellation
will be effective.  In the event the **Named Insured or Insurance Representative** cancels, the earned premium will be computed in
accordance with the customary short rate table and procedure.  Premium adjustment may be made either at the time cancellation is
effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition
of cancellation.

The Company will not be required to renew this policy upon its expiration.  If the Company elects not to renew, it will provide to the
**Named Insured or Insurance Representative** written notice to that effect (          **Forty Five**          ) ( 45 ) days (number
of days must equal or exceed forty-five (45) days) before the Expiration Date set forth in ITEM 2 of the Declarations.

If the nonrenewal notice is mailed less than forty-five (45) days prior to the policy's Expiration Date, coverage must be extended until
forty-five (45) days after the notice is mailed, with earned premium for the extended period of coverage on a pro-rata basis of the
previous year's rate.

The Company is not required to give notice of nonrenewal if:
        a)   The Company or an insurer within the same insurance group has offered to issue a renewal policy, or
        b)   The **Named Insured or Insurance Representative** has obtained replacement coverage or has agreed in writing to
             obtain replacement coverage.

If the Company provides the notice required and then extends the policy for ninety (90) days or less, an additional notice of
nonrenewal will not be required for the extension.

The Company shall give to the **Named Insured or Insurance Representative** at the mailing address shown on the policy, written
notice of premium increase, change in deductible, reduction in limits or coverage at least forty-five (45) days prior to the Expiration
Date of the policy.  If the Company fails to provide such notice, the premium, deductible, limits and coverage provided to the **Named
Insured or Insurance Representative** prior to the change shall remain in effect until notice is given or until the Effective Date of
replacement coverage obtained by the **Named Insured or Insurance Representative**, whichever occurs first.  If notice is given by
mail, the notice shall be deemed to have been given on the day notice is mailed.

LIA-5035 Rev. 1-08
© 2007 The Travelers Companies, Inc. All Rights Reserved

If the **Named Insured or Insurance Representative** elects not to renew, any earned premium for the period of extension of the terminated policy shall be calculated pro rata at the lower of the current or previous year's rate.

If the **Named Insured or Insurance Representative** accepts the renewal, the premium increase, if any, and other changes shall be effective the day following the prior policy's expiration date. This subsection shall not apply to: 1) Changes in a rate or plan filed with or approved by the Insurance Commissioner or filed pursuant to the Property and Casualty Competitive Loss Cost Rating Act and applicable to an entire class of business; 2) Changes based upon the altered nature of extent of the risk insured; or 3) Changes in policy forms filed with or approved by the Insurance Commissioner and applicable to an entire class of business.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above mentioned policy, except as expressly stated herein. This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations and this endorsement is part of such policy and incorporated therein.

LIA-5035 Rev. 1-08
© 2007 The Travelers Companies, Inc. All Rights Reserved

ISSUED BY: Travelers Casualty and Surety Company of America        POLICY NO: 105446858

ISSUED TO: National Credit Solutions, LLC

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### PRIOR ACTS EXCLUSION

This endorsement modifies the following coverage(s):

Liability Coverage                                                Retroactive Date

**Miscellaneous Professional Liability**                          04/17/2009

In consideration of the payment of the premium, this **Liability Coverage** shall not apply to, and the Company shall have no duty to defend or to pay, advance or reimburse **Defense Expenses** for, any **Claim** based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any **Wrongful Act** committed or alleged to have been committed, in whole or in part, prior to the applicable Retroactive Date set forth above.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on
**May 1, 2010**, if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:        _____
                    On behalf of the entity named in
                    ITEM 1 of the Declarations.


                    _____
                    Authorized Company Representative

ISSUED BY: Travelers Casualty and Surety Company of America      POLICY NO: 105446858

ISSUED TO: National Credit Solutions, LLC

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**OKLAHOMA CHANGES**

This endorsement modifies insurance provided under the following:
**Liability Coverage Terms and Conditions**

The following is added to Section III. CONDITIONS U. REPRESENTATIONS as required by Oklahoma Regulation 365: 15-1-10(c):

WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony."

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above mentioned Policy, except as expressly stated herein. This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations and this endorsement is part of such Policy and incorporated therein.

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 105446858

ISSUED TO: National Credit Solutions, LLC

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### OKLAHOMA FRAUD WARNING

The following provision is added to the policy and supersedes anything to the contrary:

**WARNING:**

Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above mentioned Policy, except as expressly stated herein.  This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations and this endorsement is part of such Policy and incorporated therein.

ILT-1042 (07-05)



**Wrap✦** <sup>SM</sup>

Miscellaneous Professional Liability

**THIS IS A CLAIMS MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ ALL TERMS CAREFULLY.**

**I.    INSURING AGREEMENTS**

A.    The Company shall pay on behalf of the **Insured Loss** for any **Claim** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period for a **Wrongful Act**.

B.    The Company will reimburse the **Insured** for **Defense Expenses** incurred in responding to a **Disciplinary Proceeding** commenced during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period. The maximum amount available for **Defense Expenses** for such **Disciplinary Proceedings** shall be ten thousand dollars ($10,000) for each **Policy Period**, regardless of the number of **Disciplinary Proceedings**, and any payment made hereunder shall not be subject to a Retention and shall not reduce any applicable limit of liability.  Except as provided herein, the Company shall not pay any **Loss** incurred as the result of **Disciplinary Proceedings**.

**II.    DEFINITIONS**

Wherever appearing in this **Liability Coverage**, the following words and phrases appearing in bold type shall have the meanings set forth in this Section II. DEFINITIONS:

A.    "**Claim**" means:

   1.    a written demand for monetary relief;

   2.    a civil proceeding commenced by service of a complaint or similar pleading;

   3.    a formal administrative or regulatory proceeding commenced by filing of a notice of charges, formal investigative order, service of summons or similar document;

   4.    an arbitration, mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

   5.    a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding;

against an **Insured** for a **Wrongful Act** committed by the **Insured** or by any other person for whose **Wrongful Acts** the **Insured** is legally responsible.

A **Claim** shall be deemed to be made on the earliest date such written notice thereof is received by an **Executive Officer**.

B.    "**Disciplinary Proceeding**" means any proceeding by a regulatory or disciplinary official, board or agency to investigate charges of professional misconduct in the performance of **Professional Services**.

C.    "**Employee**" means a natural person whose labor or service is engaged by and directed by the **Insured Organization** and:

   1.    who is on the payroll of the **Insured Organization**, including:

      a.    any in-house general counsel of the **Insured Organization**; and

      b.    any other  full-time, part-time, temporary and seasonal workers;

   2.    whose services have been leased by the **Insured Organization**.

Independent contractors are not **Employees**. The status of an individual as an **Employee** shall be determined as of the date of the alleged **Wrongful Act**.

D.     **"Executive Officer"** means a member of the board of directors, officer, natural person partner, principal, risk manager or LLC **Manager**, in-house general counsel of the **Insured Organization** or a functional equivalent thereof.

E.     **"Insured"** means the **Insured Persons** and the **Insured Organization**.

F.     **"Insured Organization"** means the **Named Insured** and any **Subsidiary**.

G.     **"Insured Person"** means any natural person who was, is or becomes a member of the board of directors, officer, **Employee**, partner or LLC **Manager** of the **Insured Organization** for **Wrongful Acts** committed in the discharge of his or her duties as such.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

H.     **"Loss"** means **Defense Expenses** and money which an **Insured** is legally obligated to pay as a result of a **Claim**, including settlements; judgments; back and front pay; compensatory damages; punitive or exemplary damages if insurable under the applicable law most favorable to the insurability of punitive or exemplary damages; prejudgment and postjudgment interest; and legal fees and expenses awarded pursuant to a court order or judgment. **Loss** shall not include:

　　　　1.     civil or criminal fines; sanctions; liquidated damages; payroll or other taxes; penalties; the multiplied portion of any multiplied damage award; any return, withdrawal, restitution or reduction of professional fees, profits or other charges; or damages or types of relief deemed uninsurable under applicable law; or

　　　　2.     any amount allocated to non-covered loss pursuant to Section III. CONDITIONS. P. ALLOCATION of the Liability Coverage Terms and Conditions.

I.     **"Personal Injury"** means:

　　　　1.     false arrest, detention or imprisonment, or malicious prosecution;

　　　　2.     the publication or utterance of libel, slander or other defamatory or disparaging material;

　　　　3.     invasion, infringement or interference with the rights of privacy;

　　　　4.     wrongful entry or eviction; or

　　　　5.     invasion of the right of private occupancy.

J.     **"Professional Services"** means only those services set forth in ITEM 5 of the Declarations that the **Insured** performs for others for a fee.

K.     **"Subsidiary"** means:

　　　　1.     any corporation, partnership or limited liability company organized under the laws of any state, in which, on or prior to the Inception Date set forth in ITEM 2 in the Declarations, the **Named Insured** owns, directly or through one or more **Subsidiaries**, more than fifty percent (50%) of the outstanding securities or voting rights representing the right to vote for the election of, or to appoint such organization's board of directors, board of trustees, board of managers or a functional equivalent thereof, or to exercise a majority control of the board of directors, board of trustees, board of managers or a functional equivalent thereof; and

　　　　2.     subject to the provisions set forth in the Section III. CONDITIONS L. ACQUISITIONS of the Liability Coverage Terms and Conditions, any organization that the **Insured Organization** acquires or forms during the **Policy Period** in which the **Named Insured** owns, directly or through one or more **Subsidiaries**, more than fifty percent (50%) of the outstanding securities or voting rights representing the right to vote for the election of, or to appoint such organization's board of directors, board of trustees, board of managers or a functional equivalent thereof, or to exercise a majority control of the board of directors, board of trustees, board of managers or a functional equivalent thereof.

L.     **"Wrongful Act"** means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, an **Insured** in the rendering or failure to render **Professional Services**.

MPL-3001 (07-05)                                                                                                                    Page 2 of 5

All Related Wrongful Acts are a single Wrongful Act for purposes of this Liability Coverage, and all Related Wrongful Acts shall be deemed to have occurred at the time the first of such Related Wrongful Acts occurred whether prior to or during the Policy Period.

## III.   EXCLUSIONS

A.   This Liability Coverage shall not apply to, and the Company shall have no duty to defend or to pay, advance or reimburse Defense Expenses for, any Claim:

   1.   for any actual or alleged damage to, or destruction of, loss of, or loss of use of, any tangible property including without limitation inadequate or insufficient protection from soil or ground water movement, soil subsidence, mold, toxic mold, spores, mildew, fungus, or wet or dry rot;

   2.   for any actual or alleged bodily injury, sickness, disease, death, loss of consortium, emotional distress, mental anguish, humiliation, or loss of reputation of any person;

   3.   based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged nuclear reaction, nuclear radiation, radioactive contamination, or radioactive substance, or the hazardous properties of nuclear material; or infectious waste or medical waste;

   4.   based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any Pollution;

   5.   based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any fact, circumstance, situation, transaction, event or Wrongful Act underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding against any Insured as of the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this Liability Coverage;

   6.   for or arising out of facts, transactions or events which are or reasonably would be regarded as a Wrongful Act, about which any Executive Officer had knowledge prior to the applicable Continuity Date set forth in ITEM 5 of the Declarations for this Liability Coverage;

   7.   based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any fact, circumstance, situation, transaction, event or Wrongful Act which, before the Inception Date set forth in ITEM 2 of the Declarations, was the subject of any notice of claim or potential claim given by or on behalf of any Insured under any policy of insurance of which this Liability Coverage is a direct or indirect renewal or replacement;

   8.   for any actual or alleged violation of responsibilities, duties or obligations under any law concerning Social Security, unemployment insurance, workers' compensation, disability insurance, or any similar or related federal, state or local law or regulation, or for any actual or alleged violation of the Worker Adjustment and Retraining Notification Act (WARN), Occupational Safety and Health Act (OSHA), Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the National Labor Relations Act (NLRA), Fair Labor Standards Act (FLSA), or amendments thereto or regulations promulgated thereunder, or any similar or related federal, state or local law or regulation;

   9.   for any actual or alleged violation of responsibilities, duties or obligations under the Employee Retirement Income Security Act of 1974 (ERISA), including amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law or regulation; or for an Insured's failure or refusal to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an Employee or dependent in, any employee benefit plan, fund or program, including contracts or agreements which are not subject to the provisions of ERISA;

   10.   by any relative of the Insured by blood or marriage or by any member of the Insured's immediate family;

   11.   by or on behalf of, or in the name or right of, any Insured or any entity:

      a.   owned, operated or controlled by any Insured;

      b.   that owns, operates or controls any Insured; or

      c.   in which any Insured is a member of the board of directors, officer, member of the board of managers, partner or principal stockholder;

12.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any **Wrongful Act** by a **Subsidiary** or any related **Insured Person** occurring at any time during which such entity was not a **Subsidiary**;

13.    for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, service mark, trade name, trade secret or any other intellectual property rights;

14.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, the liability of others assumed by an **Insured** under any contract or agreement, whether oral or written, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement;

15.    for non-monetary or equitable relief;

16.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged commission of a crime or violation of a criminal statute;

17.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any **Personal Injury**;

18.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any discrimination, humiliation, harassment or misconduct by an **Insured** because of race, creed, color, age, gender, sex, sexual preference or orientation, national origin, religion, disability, handicap, marital status or any other class protected under federal, state, local or other law;

19.    for any actual or alleged violation of any law, rule or regulation relating to antitrust, or the prohibition of monopolies; or

20.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any commingling of, or failure to segregate, funds or assets.

B.    The Company shall have no duty to pay Loss, other than **Defense Expenses**, for any **Claim** based upon, arising out of, or in any way relating to, directly or indirectly, any **Insured**:

1.    committing any intentionally dishonest or fraudulent act or omission;

2.    committing any willful violation of any statute, rule or law; or

3.    gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled;

provided that this Exclusion B. shall not apply unless a judgment or other final adjudication establishes that such **Insured** committed such intentionally dishonest or fraudulent act or omission, or willful violation of any statute, rule or law, or gained such profit, remuneration or advantage to which such **Insured** was not legally entitled.

## IV.    SEVERABILITY OF EXCLUSIONS

No conduct of any **Insured Person** shall be imputed to any other **Insured Person** to determine the application of any of the Exclusions set forth in Section III. EXCLUSIONS above.

## V.    CONDITIONS

### A.    RETENTION

This Section V. CONDITIONS A. RETENTION shall supplement, and not replace Section III. CONDITIONS B. RETENTION of the Liability Coverage Terms and Conditions.

If any **Claim** alleges that an **Insured** committed any intentionally dishonest or fraudulent act or omission or any willful violation of any statute, rule or law, or gained any profit, remuneration or advantage to which such **Insured** was not legally entitled, then no retention shall apply to **Defense Expenses** resulting from such **Claim**, and the Company shall reimburse the **Insured Organization** for any **Defense Expenses** paid by the **Insured Organization** in connection with any such **Claim**, if:

1.    with respect to such **Claim**, there is a final judgment of no liability obtained prior to or during trial, in favor of all **Insureds**, by reason of a motion to dismiss or a motion for summary judgment or any similar motion or process, after exhaustion of all appeals, or a final judgment of no liability obtained after trial, in favor of all **Insureds**, after exhaustion of all appeals; or

2.      such **Claim** is dismissed or there is a stipulation to dismiss such **Claim** with prejudice and without the payment of any monetary consideration by the **Insureds**.

In no event shall a settlement of a **Claim** be considered a final judgment of no liability for purposes of this subsection.  As a condition of any reimbursement of **Defense Expenses** as set forth above, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of such amounts in the event that such **Claim** is reinstituted after payment by the Company.

B.     SETTLEMENT

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient.  In the event that the Company recommends an offer of settlement of any **Claim** which is acceptable to the claimant(s) (a "Settlement Offer"), and if the **Insured** shall refuse to consent to such Settlement Offer, the **Insured** shall be solely responsible for thirty percent (30%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** shall also be responsible for thirty percent (30%) of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** shall not exceed the applicable limit of liability.

C.     LIMIT OF LIABILITY

This Section V. CONDITIONS C. LIMIT OF LIABILITY shall supplement, and not replace, Section III. CONDITIONS C. LIMITS OF LIABILITY of the Liability Coverage Terms and Conditions.

The Company's maximum limit of liability for **Loss**, including **Defense Expenses**, for each **Claim** shall not exceed the applicable limit of liability for each **Claim** set forth in ITEM 5 of the Declarations for this **Liability Coverage**, regardless of when payment is made and regardless of when an **Insured**'s legal obligation with regard thereto arises or is established.

D.     OTHER INSURANCE

This **Liability Coverage** shall apply only as excess insurance over, and shall not contribute with any other valid and collectible insurance available to the **Insured**, including but not limited to any insurance under which there is a duty to defend, unless such insurance is written specifically excess of this **Liability Coverage** by reference in such other policy to the Policy Number of this **Liability Policy**.  This **Liability Coverage** shall not be subject to the terms of any other insurance.

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 105446858

ISSUED TO: National Credit Solutions, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**OKLAHOMA CHANGES**

This endorsement modifies insurance provided under the following:
**Miscellaneous Professional Liability**

1.   **Section II. DEFINITIONS H. "Loss"** is amended by deleting the phrase "most favorable to the insurability of punitive or exemplary damages."

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above mentioned Policy, except as expressly stated herein.  This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations and this endorsement is part of such Policy and incorporated therein.

ISSUED BY: Travelers Casualty and Surety Company of America        POLICY NO: 105446858

ISSUED TO: National Credit Solutions, LLC

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

NETWORK AND INFORMATION SECURITY OFFENSE COVERAGE ENDORSEMENT WITH
ADDITIONAL EXPENSE LIMIT OF LIABILITY FOR CRISIS MANAGEMENT EVENT EXPENSES

This endorsement modifies the following coverage:
**Miscellaneous Professional Liability**

It is agreed that:

1.   The following is added to ITEM 5. of the Declarations:

**Crisis Management Event Expenses**
**Limit of Liability:**              **$25,000 for all Crisis Management Event Expenses**

2.   The following is added to section **III. CONDITIONS**, C. LIMITS OF LIABILITY, 1., of the Liability Coverage
Terms and Conditions:

The Company's maximum limit of liability for all **Crisis Management Event Expenses** under the Miscellaneous
Professional Liability coverage shall not exceed the Crisis Management Event Expenses Limit of Liability set
forth in ITEM 5 of the Declarations. The Crisis Management Event Expenses Limit of Liability is in addition to
the **Liability Coverage Limit of Liability** for the Miscellaneous Professional Liability coverage. However, if
**Crisis Management Event Expenses** are covered under more than one **Liability Coverage** made part of this
**Liability Policy**, then the Company's maximum liability for such **Crisis Management Event Expenses** shall not
exceed the amount of the largest applicable and remaining Crisis Management Event Expenses Limit of Liability
for any Liability Coverage set forth in the Declarations, which shall be the maximum amount applicable to all
**Crisis Management Event Expenses** under the **Liability Policy**.

3.   The following is added to section **I. INSURING AGREEMENTS**, of the Miscellaneous Professional
Liability coverage:

The Company shall pay on behalf of the **Insured Organization Crisis Management Event Expenses**
incurred by the **Insured Organization** as a result of any **Network and Information Security Offense** first
occurring and reported to the Company during the **Policy Period**, or if exercised, during the Extended
Reporting Period or Run-Off Extended Reporting Period. The payment of **Crisis Management Event
Expenses** is not subject to any Retention.

4.   The following is added to section **II. DEFINITIONS, L. "Wrongful Act"** of the Miscellaneous Professional
Liability coverage:

**Wrongful Act** also means any actual or alleged **Network and Information Security Offense** by, or
asserted against, an **Insured Person**, in his or her capacity as such, or the **Insured Organization**.

5.   The following definitions are added to section **II. DEFINITIONS** of the Miscellaneous Professional Liability
coverage:

"**Computer Virus**" means any malicious code which could destroy, alter, contaminate or degrade the
integrity, quality or performance of data of any computer application software, computer network, or computer
operating system or related network, upon the introduction of such malicious code through any computer,
communications equipment or communications network that is owned or operated by the **Insured
Organization**.

"Crisis Management Event Expenses" means reasonable fees, costs, and expenses incurred and paid by the **Insured Organization** for services provided by a public relations firm to the **Insured Organization** to mitigate any actual or potential negative publicity resulting from any **Network and Information Security Offense. Crisis Management Event Expenses** shall not include any:

1. costs to notify any individual or entity of a **Network and Information Security Offense** or to develop such notification documents or materials;

2. costs to determine the scope of, or whether any, **Network and Information Security Offense** has occurred; or

3. costs paid by any **Insured** intended as compensation for any individual or entity as a result of a **Network and Information Security Offense.**

"**Network and Information Security Offense**" means:

1. the failure to prevent the transmission of a **Computer Virus;**

2. the failure to provide any authorized user of the **Insured Organization's** website, or the **Insured Organization's** computer or communications network, with access to such website, or computer or communications network;

3. the failure to prevent unauthorized access to, or use of, data containing private or confidential information of others; or

4. the failure to provide notification of any actual or potential unauthorized access to, or use of, data containing private or confidential information of others if such notification is required by any state or federal regulation or statute.

6. The following replaces section **III. EXCLUSIONS,** A. 17 of the Miscellaneous Professional Liability coverage:

   A. This **Liability Coverage** shall not apply to, and the Company shall have no duty to defend or to pay, advance or reimburse **Defense Expenses** for, any **Claim:**

   17. based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any **Personal Injury;** provided that this exclusion shall not apply to any **Claim** for invasion, infringement or interference with the rights of privacy with respect to any **Network and Information Security Offense;**

7. The following is added to section **III. EXCLUSIONS,** A. of the Miscellaneous Professional Liability coverage:

   A. This **Liability Coverage** shall not apply to, and the Company shall have no duty to defend or to pay, advance or reimburse **Defense Expenses** for, any **Claim:**

   based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any **Network and Information Security Offense** that results in:

   1. the failure to provide access to the **Insured Organization's** website, or the **Insured Organization's** computer or communications network, that was expected or intended by any **Insured;** or

2.   any Internet service interruption or failure, provided that this exclusion shall not apply if the interruption or failure was caused by an **Insured**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on
**May 1, 2010**, if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:        _____
                    On behalf of the entity named in
                    ITEM 1 of the Declarations

                    _____
                    Authorized Company Representative

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 105446858

ISSUED TO: National Credit Solutions, LLC

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**COLLECTION PROFESSIONALS ENDORSEMENT**

This endorsement modifies the following coverage:

**Miscellaneous Professional Liability**

It is agreed that:

I.      The following replaces section **II. DEFINITIONS** , E. " **Insured** ":

     E.      " **Insured** " means:
           1.  the **Insured Persons** ;
           2.  the **Insured Organization** ; and
           3.  any **Client** of the **Insured Organization** ; provided that such **Client** is an **Insured** only for **Claims** resulting from an actual or alleged **Wrongful Act** committed solely by any **Insured** other than a **Client.**

II.     The following replaces section **II. DEFINITIONS** , J. " **Professional Services** ":

     J.     " **Professional Services** " means only those services set forth in ITEM 5 of the Declarations that the **Insured** performs.

III.    The following is deleted from section **II. DEFINITIONS** :

     I.     "**Personal Injury**"

IV.     The following are added to section **II. DEFINITIONS** :

"**Client**" means any recipient of **Professional Services** .

"**Collection of Owned Debt**" means the use of any instrumentality of interstate commerce or the mails in the collection or attempted collection of **Owned Debt** .

"**Consumer**" means any natural person or organization that is actually or allegedly obligated to pay any **Debt** or is the subject of any **Consumer Report** .

" **Consumer Report** " means any written, oral, or other communication of any information by a consumer reporting agency bearing on a **Consumer's** credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living.

"**Consumer Reporting Agency Services**" means the assembling or evaluating of **Consumer** credit information or other information on **Consumers** for the purpose of furnishing **Consumer Reports** to third parties, and which uses any means or facility of interstate commerce for the purpose or preparing or furnishing **Consumer Reports** for a fee, dues, or on a cooperative nonprofit basis.

" **Debt** " means any actual or alleged obligation of a **Consumer** to pay money whether or not such obligation has been reduced to judgment.

MPL-7113 (11-09)                                                                                                              Page 1 of 3

" **Debt Collection Services** " means the use of any instrumentality of interstate commerce or the mails in the collection or attempted collection of **Debt** that is not **Owned Debt** .

" **Owned Debt** " means **Debt** that, through purchase or guarantee, is owned or acquired by any **Insured Person**, any **Insured Organization**, or any **Related Entity.**

"**Related Entity**" means any person or entity:
1.    owned, operated or controlled by any **Insured** ;
2.    that owns, operates or controls any **Insured** ;
3.    affiliated with any **Insured** through common ownership or control; or
4.    in which any **Insured** has at least 10% equity and is a partner, director or officer of such entity.

V.    Section **III.** EXCLUSIONS , A.3. is deleted.

VI.    Section **III.** EXCLUSIONS , A.10.is deleted.

VII.    Section **III.** EXCLUSIONS , A. 15. is deleted.

VIII.    Section **III.** EXCLUSIONS , A.16.is deleted.

IX.    Section **III.** EXCLUSIONS , A.17.is deleted.

X.    The following replaces section **III. EXCLUSIONS** , A., 2.:

2.    for any actual or alleged bodily injury, sickness, disease, death, loss of consortium, or loss of reputation of any person;

XI.    The following replaces section **III. EXCLUSIONS** , A., 11.:

11.    by or on behalf of , or in the name or right of, any **Insured, Client,** or any entity:
a.    owned, operated, or controlled by any **Insured;**
b.    that owns, operates or controls any **Insured;** or
c.    in which any **Insured** is a member of the board of directors, officer, member of the board of managers, partner or principal stockholder;

XII.    The following are added to section **III. EXCLUSIONS** , A.:

based upon, alleging, arising out of, or in any way relating to, directly or indirectly:
a.    title or property searches;
b.    the guaranty of any check; or
c.    repossessions by or on behalf of any **Insured** ;

based upon, alleging, arising out of, or in any way relating to, directly or indirectly, prescreening services for credit;

based upon, alleging, arising out of, or in any way relating to, directly or indirectly, the failure to remit or collect funds.

XIII.    The following replaces section **III. EXCLUSIONS** , B.:

B.    The Company shall have no duty to pay **Loss** , other than **Defense Expenses** , for any **Claim** :

1.    based upon, arising out of, or in any way relating to, directly or indirectly, any **Insured** :
a.    committing any criminal, dishonest, or fraudulent act;
b.    committing any willful violation of any statute, rule, or law; or

    c.    gaining any profit, remuneration, or advantage to which such **Insured** was not legally entitled,

provided that this exclusion shall not apply unless a final adjudication establishes that such **Insured** committed such criminal, dishonest, or fraudulent act, or willful violation of statute, rule, or law, or gained such profit, remuneration, or advantage to which such **Insured** was not legally entitled;

2.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, the failure of any **Insured** to obtain or maintain proper licenses or bonds;

3.    for injunctive or non-monetary relief.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on **May 1, 2010**, if indicated herein. Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:    _____
                On behalf of the entity named in
                ITEM 1 of the Declarations

                _____
                Authorized Company Representative

# EXHIBIT B

**ISSUED BY: Travelers Casualty and Surety Company of America**　　　　**POLICY NO: 105446858**

**ISSUED TO: National Credit Solutions, LLC**

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### ELECT EXTENDED REPORTING PERIOD

This endorsement modifies the following coverage:
**MPL**

In consideration of the payment of the premium:

1.　　This **Liability Coverage** has been canceled or non-renewed effective **May 01, 2011.**　　　　The **Named Insured** has exercised its rights and shall be subject to Section III. CONDITIONS O. of the Liability Coverage Terms and Conditions.

2.　　Section III CONDITIONS K. of the Liability Coverage Terms and Conditions is deleted.

3.　　The second paragraph of Section III. CONDITIONS Q. of the Liability Coverage Terms and Conditions is deleted.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on
　　**May 01, 2011**, if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:　　_____

　　　　　　　　On behalf of the entity named in
　　　　　　　　ITEM 1 of the Declarations.

　　　　　　　　_____

　　　　　　　　Authorized Company Representative

LIA-7010 (07-05)

# EXHIBIT C

Christopher J. Carolan (admitted *pro hac vice*)
Gregory R. Yates (admitted *pro hac vice*)
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 218-3356

John A. Bicks (NY 2032498) (admitted *pro hac vice*)
Lani A. Adler (NY 1860543)
K&L GATES LLP
599 Lexington Avenue
New York, New York 10022-6030
Telephone: (212) 536-3900

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone: (804) 644-1700

*Attorneys for Corliss Moore & Associates, LLC,*
*solely in its capacity as Liquidating Trustee for the*
*First Lien Term Lenders Liquidating Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| MOVIE GALLERY, INC., et al.,[1] | Case No. 10-30696-(DOT) |
| Debtors. | (Jointly Administered) |
| | |
| CORLISS MOORE & ASSOCIATES, LLC, solely in its capacity as Liquidating Trustee for the First Lien Term Lenders Liquidating Trust, | |
| Plaintiff, | |
| v. | Adv. Pro. No. _____ |
| CREDIT CONTROL SERVICES, INC. and NATIONAL CREDIT SOLUTIONS, LLC, | |
| Defendants. | |

---

[1] The Debtors in these cases were: Movie Gallery, Inc., Hollywood Entertainment Corporation, Movie Gallery US, LLC, MG Real Estate, LLC, and HEC Real Estate, LLC. The Debtors were substantively consolidated under their confirmed plan and liquidating trusts were established to implement the confirmed plan.

4840-1687-1183.3

## COMPLAINT

Corliss Moore & Associates, LLC (the "Liquidating Trustee") solely in its capacity as Liquidating Trustee for the First Lien Term Lenders Liquidating Trust (the "Trust"), through its undersigned counsel, states its complaint against Defendants Credit Control Services, Inc. ("CCS") and National Credit Solutions, LLC ("NCS"), as follows:

### NATURE OF THE ACTION

1.      Pursuant to a written agreement, the Debtors hired CCS to lawfully collect amounts owed to them from consumers (the "Customer Receivables"), the proceeds of which were to be made available to the creditors of Movie Gallery, Inc., Hollywood Entertainment Corporation, Movie Gallery US, LLC, MG Real Estate, LLC, and HEC Real Estate, LLC (collectively, the "Debtors"). The contract provided, among other things, that CCS could subcontract out to "its vendor network," collection of the smaller amounts owed, that all collection activity would be in compliance with applicable law and that CCS would be responsible to make the Debtors whole, and to indemnify them, if the agreement were breached or if the Debtors were damaged by CCS' negligence or omission or wrongful act. Unbeknownst to the Debtors or the Liquidating Trustee, CCS almost immediately subcontracted the collection of nearly all of the approximately 3.3 million accounts constituting the Customer Receivables debt portfolio to NCS. The agreement between CCS and NCS likewise provided that all collections of debts owed to the Debtors would be undertaken in compliance with all applicable state and federal laws, and that NCS would indemnify CCS and the Debtors for any damages and attorneys fees generated as a result of NCS' actions. The collection activities undertaken by NCS and by CCS did not comply with applicable law, and resulted in a huge number of consumer disputes, investigations by various state Attorneys General and, ultimately, the entry of a consent order precluding the Trust from, among other things, credit reporting. CCS' and NCS'

2

4840-1687-1183.3

conduct has (i) greatly impaired and delayed the Liquidating Trustee's ability to collect the

Customer Receivables; (ii) profoundly diminished the value of the Trust's portfolio of Customer

Receivables; and (iii) caused the Liquidating Trustee to incur substantial attorneys fees and costs.

Accordingly, the Liquidating Trustee, appointed to administer the Debtors' assets, sues to

recover the losses in the realizable value caused to the Customer Receivables by reason of NCS'

and CCS' activities and the attorneys fees the Trust has had to expend as a direct consequence of

CCS' and NCS' acts.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157 and 1334.

3.    This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. §

157(b)(2).

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

## THE PARTIES

5.    On February 2, 2010 (the "Commencement Date"), each of the Debtors filed a

petition with the Court under Chapter 11 of the Bankruptcy Code. On February 3, 2010, the

Bankruptcy Court entered its Order Directing Joint Administration of the Debtors' Related

Chapter 11 Cases [Docket No. 64]. Until the Effective Date (defined below), the Debtors were

operating their businesses and managing their properties as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

6.    On July 13, 2010, the Debtors filed their Joint Plan of Liquidation of Movie

Gallery, Inc. and Its Affiliated Debtors and Debtors in Possession (as amended, the "Plan").[1]

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

The Plan provided for the liquidation of all of the Debtors' assets, and provided that substantially all of the proceeds of that liquidation would be made available to the Debtors' secured lenders, while $5 million of such proceeds would be made available to satisfy claims of general unsecured creditors. The Plan further provided for entry of an order substantively consolidating the Debtors' estates. On October 29, 2010 (the "Confirmation Date"), this Court issued an order (the "Confirmation Order") confirming the Plan.

7.      The Plan also provided for the establishment of the Trust, which, on the Effective Date of the Plan, was to receive the Cash and Other Assets for the benefit of the Debtors' First Lien Term Lenders, and to pay certain allowed priority, administrative and Class 3 claims as provided in the Plan. The Plan further provided that the Trust, could, among other things, pursue, settle or compromise any Causes of Action of the Debtors that were not explicitly released either by the Plan or by order of the Court. As set forth in the Notice of Effective Date of Joint Plan of Liquidation of Movie Gallery, Inc. and its Affiliated Debtors and Debtors in Possession [Docket No. 2501], the Effective Date occurred on November 18, 2010.

8.      Upon the occurrence of the Effective Date, the assets and liabilities of all the Debtors were substantively consolidated, the Other Assets (as defined in the Plan and which did not include $5 million transferred to the GUC Liquidating Trust (as defined in the Plan)) were transferred to the Trust and are being administered by the Liquidating Trustee.

9.      Since the Effective Date, the Trust, under the direction of the Liquidating Trustee and subject to the supervision of its oversight board, has been administering the assets transferred to it, consistent with, and pursuant to the terms of, the Plan.

4

10.    Defendant CCS is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at Two Wells Avenue, Newton, Massachusetts 02549.

11.    On information and belief, Defendant NCS is a limited liability company organized and existing under the laws of the State of Oklahoma, with its principal place of business located at 3680 East I-240 Service Road, Oklahoma City, Oklahoma 73135.

## FACTUAL BACKGROUND

**The Customer Receivables**

12.    Prior to the commencement of their chapter 11 cases, the Debtors rented and sold videos and video games from more than 2,500 retail store locations across the United States, doing business under the names Hollywood Video and Movie Gallery. In connection with the operation of the Debtors' video and video game rental business, the Debtors' rental customers routinely incurred various fees and charges that were due and payable to the Debtors consistent with the terms of their rental agreements. Those fees and charges included late fees charged when videos or video games were not returned when due, as well as product charges that were assessed when rented items were returned damaged, or were not returned by the customer after an extended period of time beyond the due date. By the time the Debtors closed their last retail stores in the summer of 2010, there were approximately 3.3 million customer accounts with debts aggregating more than $244 million in Customer Receivables owed to the Debtors.

**The Debtors' Retention of CCS**

13.    In order to discharge their fiduciary duties to creditors and maximize the value of their estates, following the closing of their retail stores, the Debtors sought to engage a collection agency to pursue the collection of the Customer Receivables. Following discussions with other

5

collection agencies, on or about September 13, 2010, Debtors Movie Gallery US, LLC ("Movie Gallery") and Hollywood Entertainment Corporation ("Hollywood Video") entered into an agreement with CCS to collect the Customer Receivables (the "CCS Agreement"). A true and accurate copy of the CCS Agreement is attached as Exhibit A hereto.

14.    Pursuant to the CCS Agreement, CCS agreed to pursue collection of accounts referred to it by Movie Gallery and Hollywood Video in return for payment of the contingent fee amounts set forth on the attachment to the CCS Agreement "in a commercially reasonable manner and in compliance with all applicable laws...." In paragraph 4 of the CCS Agreement, CCS, on the one hand, and Movie Gallery and Hollywood Video, on the other, further agreed:

> to reimburse and make the other whole on account of any breach of the Agreement or by its negligent error or omission and/or wrongful act; and (ii) to indemnify and hold the other harmless from any and all judgments, fines and penalties, amounts paid in settlement, damages, claims, causes of action and reasonable costs and expenses, including attorneys fees and expenses, which the other may pay or incur as a result of a breach of the Agreement or caused in whole or in part as a result of a negligent error or omission and/or wrongful act of the other.

15.    CCS further agreed that, during the term of the CCS Agreement, it would "procure and maintain in effect, in customary forms and coverage amounts, all types of insurance which are standard in its industry", and agreed to provide evidence of such insurance to Movie Gallery and/or Hollywood Video upon request. (CCS Agreement, ¶ 14).

16.    The CCS Agreement also provided that CCS could "utilize its vendor network to expedite the process and/or facilitate listing small balanced accounts." (CCS Agreement, ¶ 3).

**CCS' Involvement of NCS in Collection Efforts**

17.    On information and belief, in October 2010, without informing either Movie Gallery or Hollywood Video in advance, CCS subcontracted with NCS for NCS to undertake

6

collection of about 99% of the customer accounts that made up the Customer Receivables. A true and accurate copy of the agreement entered into by CCS and NCS on or about October 10, 2010, (the "NCS Agreement") is annexed as Exhibit B hereto. Among other things, the NCS Agreement obligated NCS to comply with all applicable state and federal laws and regulations in undertaking collections of the Movie Gallery and Hollywood Video accounts, including the Fair Debt Collection Practices Act. The NCS Agreement also explicitly provided that, for consumer accounts which were reported to credit agencies only (and as to which NCS did not send the consumers debt collection letters), NCS would receive a 15% fee on the principal amount of each debt it recovered, and would retain 100% of all of the collection fees and/or interest it recovered on each debt. For consumer accounts as to which NCS would both send the customer letters and report the debts to credit agencies, the NCS Agreement provided that NCS would receive a 25% fee on the principal amount of each debt it recovered, and would still retain all of the collection fees and/or interest it recovered on each debt. The NCS Agreement also required NCS to obtain CCS' advance written permission if NCS wished to credit report any account or settle or resolve any account by accepting less than half of the debt's principal value. The NCS Agreement expressly stated that CCS allowed NCS to charge for "any fees or interest over the principal amount" of the debt, and that "all [such] fees and/or interest over the principle (sic)" would be "100%" retained by NCS.

18.     Movie Gallery and Hollywood Video were not consulted about, and did not know, in advance, of NCS' involvement in debt collections for them or that CCS and NCS had agreed that NCS would charge collection fees.

4840-1687-1183.3

19.    On information and belief, of the approximately 3.3 million customer accounts which CCS was hired to collect for the Debtors in September 2010, CCS kept only about 30,000 accounts for itself, and transferred all of the remaining accounts to NCS.

20.    On information and belief, CCS kept for itself those Movie Gallery and Hollywood Video accounts as to which the debts were each in excess of $150, and transferred all of the other debts to NCS for collection.  CCS also transferred to NCS all of the Hollywood Video and Movie Gallery accounts for customers located in California and Utah because those states require that consumers must be sent notices in advance that they will be "credit reported" if their debts are not paid or resolved.

21.    CCS initially instructed NCS to only credit report (and not to first communicate with the consumers by letter) all of the Hollywood Video/Movie Gallery debts CCS subcontracted to NCS, and to do so as quickly as possible.

**CCS' and NCS' Unlawful Recovery of Collection Fees from Movie Gallery and Hollywood Video Customers**

22.    Among other things, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692(f)(i), precludes a debt collector from collecting any amount, including a collection fee or interest, unless collection of that amount is expressly authorized by the agreement creating the debt or by law.

23.    While the Hollywood Video customer agreement provides that collection fees may be recovered if a consumer fails to timely pay what is owed, the Movie Gallery customer agreement did not contain such a provision.

24.    Accordingly, under the FDCPA, recovery of any collection fees in connection with collection efforts by NCS and/or CCS of any debts owed by Movie Gallery customers was unlawful.

8

25.     On information and belief, from October 2010 until a point in time between December 2010 and January 2011, NCS unlawfully, and in violation of the FDCPA, undertook activities to collect on Movie Gallery and Hollywood Video accounts which included collection of, and attempts to collect, a $75 collection fee on each consumer account for which NCS undertook collection.

26.     CCS knew, or should have known, that NCS was collecting and seeking to collect these $75 collection fees on Movie Gallery accounts. Exhibit A to the NCS Agreement explicitly authorized NCS to charge fees and/or interest over the principal amounts owed and specified that "[a]ll fees and/or interest" beyond the principal amount of the debt were to be retained, in full, by NCS.

27.     For at least four years prior to the Debtors' cessation of business at their retail locations, CCS had collected delinquent customer charges for both Hollywood Video and Movie Gallery.

28.     CCS was aware, at least as early as August 2010, that there was one consumer agreement for Hollywood Video and that there was another, different consumer agreement for Movie Gallery. On or about August 25, 2010, a CCS employee with the email address kminolta@ccsusa.com sent Andrew Lynch of CCS two separate emails. Mr. or Ms. Minolta first sent Mr. Lynch the Movie Gallery customer agreement, which does not have language authorizing collection fees in addition to late charges and product charges. Immediately thereafter, Mr. or Ms. Minolta sent Mr. Lynch the "Contract Terms and Conditions" of the Hollywood Video customer agreement, which explicitly provided that the consumer would be charged "the costs of collection" for unpaid charges. True and accurate copies of these emails are attached hereto as Exhibits C and D, respectively. Mr. or Ms. Minolta also forwarded these

9

two customer agreements to Mark Ramsdell, the chief operating officer of CCS, at the same time.

29.     On or about September 24, 2010, CCS agreed to provide weekly collection reports to the Debtors, and to provide one report for all of the Hollywood Video accounts and another report for all of the Movie Gallery reports.

30.     CCS knew, or should have known, at least as early as August 2010, that the Movie Gallery agreement did not authorize demands for or payment of collection fees by Movie Gallery consumers, and that NCS' demand for and retention of such collection fees from Movie Gallery customers was therefore improper under the FDCPA and applicable state law.

31.     In response to a request made by NCS before it began collecting the Customer Receivables, in or about early October 2010, for copies of the pertinent Movie Gallery and Hollywood Video customer agreements, CCS sent NCS only the Hollywood Video consumer agreement, which had the provision specifying that collection fees could be charged. In response to NCS' request for both the Hollywood Video and the Movie Gallery consumer agreements, CCS did not send NCS the Movie Gallery consumer agreement, which lacked a provision authorizing collection fees, although CCS had the Movie Gallery Agreement and, on information and belief, was or should have been aware that the provisions of the Movie Gallery customer agreement did not authorize a demand for collection fees.

32.     On information and belief, CCS itself charged both Hollywood Video and Movie Gallery customers a collection fee of approximately $9.95 which it denominated as a "convenience charge" when consumers paid debts to CCS by credit card, debit card or electronic check. Under the terms of the CCS Agreement, CCS was not authorized to charge any fee in connection with the collection of Hollywood Video and Movie Gallery accounts, except for the

10

fees set forth on Attachment A to the CCS Agreement. Attachment A to the CCS Agreement did not authorize CCS to collect a "convenience charge" from any Hollywood Video or Movie Gallery customer.

33. Under the FDCPA, CCS' collection of and demand for, this "convenience charge" from any Movie Gallery customer was unlawful, since the Movie Gallery agreement did not provide for collection of such fees.

34. The $75 collection fee charged by NCS on both Hollywood Video and Movie Gallery debts was also unlawful and improper because it was unreasonably high relative to the principal amounts of the individual customer accounts.

35. CCS knew, or should have known, that the $75 fee charged by NCS was unlawful.

36. Further, the amounts that NCS reported to the credit agencies as being owed by individual consumers included both the principal amount of the debt and the unreasonably high and/or unauthorized $75 collection fee NCS added to the debts. CCS knew, or should have known, that this occurred.

37. However, regardless of whether CCS knew, or should have known, that this occurred, CCS is responsible to the Liquidating Trustee under the CCS Agreement for the damages and attorneys fees caused by this conduct. Additionally, and/or in the alternative, NCS is also responsible to the Liquidating Trustee under the NCS Agreement for the damages and attorneys fees caused by this conduct.

**The High Volume of Consumer Complaints and Inquiries from the Attorneys General**

38. As early as October 12, 2011, CCS became aware that a high number of consumers were complaining about the ongoing efforts by CCS to collect the Customer Receivables.

11

39.     With this knowledge of the unusually high number of consumer complaints about its collections of Customer Receivables, on or about October 20, 2010, CCS decided it would keep no more than 30,000 of the Hollywood Video and Movie Gallery accounts for itself, and to transfer the remaining accounts to NCS. CCS did not inform the Liquidating Trustee of this decision until at least mid-December 2010.

40.     As early as October 21, 2010, in recognition of the unusually high volume of consumer complaints it had received, CCS instructed NCS "to implement a strategy for the Movie Gallery and Hollywood Video accounts, that if you receive a dispute letter or call claiming that they do not owe the money, returned the product, or paid the store, the account gets closed."

41.     On or before October 29, 2010, CCS was contacted by email by the Chief Investigator of the Financial Fraud Section of the Oregon Department of Justice regarding its collection activities for Hollywood Video. That individual also informed CCS that his office had been flooded with calls from consumers and the media concerning collections for Hollywood Video in Oregon.

42.     On or about November 4, 2010, investigators from the State of Washington also asked CCS about certain Hollywood Video/Movie Gallery accounts collected on by CCS as to which consumers had complained.

43.     As a result, on or about November 4, 2010, CCS determined to stop all credit reporting of Hollywood Video and Movie Gallery accounts. However, CCS did not, at that time, convey its decision or the reasons for it to either Hollywood Video, Movie Gallery or to NCS.

12

44.   By or before November 9, 2012, CCS had received at least eight complaints from the Attorney General of the State of Washington, with respect to Hollywood Video collection activities undertaken by CCS in that state.

45.   On or about December 9, 2010, the Liquidating Trustee first learned that NCS had undertaken collection activities for Hollywood Video and Movie Gallery accounts because consumers contacted the Liquidating Trustee to complain about collection activities being undertaken by a firm called either "NCS" or "NCR." When the Liquidating Trustee first reached out to their CCS client services contact to inquire about an "NCS" or "NCR" being involved in the collection of the Hollywood Video/Movie Gallery account, the CCS employee indicated that CCS had no knowledge of NCS' involvement.

46.   The next day, December 10, 2010, in response to a December 9, 2010 email sent by Wes Sand, then the Movie Gallery/Hollywood Video president, to Andrew Lynch of CCS, Mr. Lynch confirmed, by return email, that NCS was "indeed the firm to whom CCS outsourced. [The Debtors] can continue to communicate with CCS on any/all matters. We [CCS] are in constant contact with our partner [NCS] to update the accounts." True and accurate copies of these emails are attached in Exhibit E hereto.

47.   In response to the Liquidating Trustee's inquiries to CCS whether particular accounts as to which the consumer disputed the debt had been closed, Mr. Lynch, on December 10, 2010, emailed the Liquidating Trustee that CCS and NCS "update one another every day." A true and accurate copy of this email is attached as Exhibit F hereto.

48.   On or about December 13, 2010, the Attorney General of the State of Connecticut requested information from CCS about disputed Hollywood Video accounts on which CCS had collected.

13

49.     On December 15, 2010, the Liquidating Trustee emailed CCS about another

instance in which the Liquidating Trustee had instructed CCS to close an account and remove the

consumer's negative credit report from the credit agency -- and learned that this had not been

done although CCS had earlier represented to the Liquidating Trustee that the account had been

closed. The Liquidating Trustee raised this in an email to CCS dated December 15, 2010, which

stated:

> This is another one where I have been talking to [the consumer]
> and assuring her that the steps are being taken to close her debt and
> remove it from collections and her credit report. I've sent the
> request to CCS and have been told it is done only to find out it still
> hasn't been resolved. Please help me get this resolved for her and
> confirm it has been done.
>
> In general can you also help me to understand what is happening?
> When I tell CCS to close the account I believe it is done. I have
> been told my communication with CCS forwards to [NCS] and
> will be resolved there by the next day. This hasn't happened for
> the customers I've been working with, so I am starting to doubt the
> system and/or think I am missing something that needs to happen.
> There are many other complaints (including Attorney General
> Letters) that I've assumed are resolved... are they really?

50.     On or before December 16, 2010, CCS became aware that the Attorney General

of the State of Washington had raised more concerns about NCS' collection activities in that

state.

51.     The Liquidating Trustee was not aware that NCS charged any collection fee until

later in January 2011; and the Liquidating Trustee only learned of it as a result of the inquiries

from various Attorneys General sent to the Liquidating Trustee. On or about January 13, 2011,

the Liquidating Trustee forwarded to CCS a letter sent by the Attorney General of Minnesota,

which referred to a customer being charged for a collection fee in addition to the amount owed to

Hollywood Video. With that emailed letter, forwarded by Wes Sand, president of Movie Gallery

and Hollywood Video, to Andrew Lynch, Mr. Sand stated: " I'm not familiar with the collection

fee and this is not something we have discussed in the past." Upon receipt of that email, a CCS employee noted that NCS added a $75 collection fee to every account.

52. On or about January 13, 2011, CCS acknowledged the problematic consequences of NCS' $75 collection fee, in an email in which CCS' COO, Mark Ramsdell wrote: "$75 for collection fee is going to get them in a lot of hot water." The same day Mr. Ramsdell also described CCS' purposeful effort to close its eyes to NCS' activities, where he stated that the more CCS seemed not to know about what NCS was doing, the more arms length the relationship between CCS and NCS would appear.

53. Until January 11, 2011, NCS did not send any letters to Hollywood Video and Movie Gallery customers; rather, acting in accordance with CCS' instructions, NCS simply reported the customers to the credit bureaus, a practice known in the collections industry as "warehousing."

54. Again, on January 14, 2011, Wes Sand, president of Movie Gallery and Hollywood Video, emailed Andrew Lynch of CCS, asking: "has CCS added a $75 collection or processing fee to the amount being sought from customers? If so, we need to know so that we can properly address questions from both customers and government agencies about our collection activity."

55. On or about January 20, 2011, in response to the magnitude of complaints from consumers and various State Attorneys General, (but without advising Hollywood Video or Movie Gallery) CCS and NCS modified their agreement, retroactive to October 2010, to provide that NCS would indemnify CCS, and CCS' customers, such as the Liquidating Trustee, with respect to "any claims, damages, costs and expenses, including reasonable attorney fees, arising

15

out of the acts, errors or omissions of [NCS], or its agents or employees, in the performance of

[NCS'] obligations" under the NCS Agreement.

56.     Similarly, in response to the high volume of consumer and Attorney General

complaints about CCS' and/or NCS' conduct in reporting information to credit reporting

agencies about Hollywood Video/Movie Gallery consumers who allegedly had not been earlier

contacted about their debts, on or about January 20, 2011, CCS proposed that NCS shift from a

strategy of credit reporting only to a strategy of first sending letters to the consumers.   In

connection with this shift in strategy, CCS proposed, and NCS agreed, that NCS would receive a

25% contingency fee payment on the amount of the principal debt it recovered from consumers

to whom it sent a collection demand letter; and that CCS would charge a flat $49 collection fee

instead of the $75 fee it had earlier charged.  Upon information and belief, once again, neither

Movie Gallery nor Hollywood Video were advised at that time of these changes to the NCS/CCS

collection strategy, or the reasons for those changes.  CCS did not inform NCS at that time, or at

any other time, that collection of any fee from Movie Gallery consumers was unlawful.

57.     On or about January 25, 2011, the Attorney General of Kansas issued a press

release stating that "Kansas consumers should be on the alert for a possible new scam" with

respect to NCS' efforts to collect on Hollywood Video accounts from Kansas consumers.  The

release goes on:

> "This appears to be a scam," Attorney General Derek Schmidt said.
> "Consumers should not pay or give any information to this organization
> over the telephone.  Instead, they should gather whatever information they
> can about the alleged debt and the caller and then report that to our office.
> We're here to help."

A true and accurate copy of this press release is attached as Exhibit H hereto.

58.     On or about January 26, 2011, the Attorney General of the State of Montana filed

a complaint against NCS alleging that NCS' actions with respect to collection of Movie Gallery

16

and Hollywood Video accounts violated Montana's Unfair Trade Practices and Consumer
Protection Act, Mont. Code Ann § 30-14-103 (the "Montana AG Complaint"). In particular, the
Montana AG Complaint alleges that NCS violated Montana law when it issued adverse credit
reports to credit bureaus about Montana consumers who purportedly owed debts to Movie
Gallery or Hollywood Video, before NCS made reasonable attempts to provide the Montana
consumers with fair notice of the alleged debts. The Montana AG Complaint also alleged,
among other things, that NCS demanded payment of a $75 collection fee when there was no
basis for collecting it on the Movie Gallery debts. A true and accurate copy of this complaint is
attached as Exhibit 1 hereto.

59.    The Attorneys General of Kansas, Washington, Illinois, Oregon and Nevada also
raised concerns about NCS' collection activities with respect to the Hollywood Video and Movie
Gallery accounts. As a result, in or about January 2011, NCS and CCS suspended all collections
on the Hollywood Video and Movie Gallery accounts.

60.    As directed by CCS, between October 2010 and January 2011, NCS sent 540,579
reports on Movie Gallery customers to credit bureaus, and sent letters to only 27 Movie Gallery
customers; and NCS sent 551,149 reports on Hollywood Video customers to credit bureaus, and
sent letters to 34,498 Hollywood Video customers.

61.    On or about January 28, 2011, Wes Sand wrote Andrew Lynch and Steve Sands,
the chief executive officer, of CCS, stating:

> The activity among State AGs and the media this week, focused
> on the reporting of consumers to the credit bureaus without notice
> and addition of high collection fees, has created a number of
> questions within our broader team. In particular, we now have
> States (i.e. Kansas) telling their consumers not to respond to
> collection notices. The concern that has been raised is that if we
> have government agencies making general statements of this

17

nature will it make the likelihood of successful collection efforts
decline to a level as to not make the overall effort worthwhile.

62.    On January 31, 2011, Mr. Sand again emailed Andrew Lynch asking if NCS had

ceased all collection activity for Hollywood Video and Movie Gallery accounts or only stopped

credit reporting.

63.    On or about February 4, 2011, an attorney in the office of the Attorney General of

the State of Illinois, sent counsel for the Liquidating Trustee a letter, sent on behalf of his office

and the Attorneys General of the states of Arkansas, California, Delaware, Iowa, Idaho,

Kentucky, Kansas, Maryland, Michigan, North Carolina, North Dakota, Nevada, Ohio,

Oklahoma, Oregon, South Carolina, Tennessee, Virginia, Wisconsin and the Georgia Office of

Consumer Protection, with respect to the "very large number of complaints relating to the

ongoing third-party debt collection of alleged debts" owed by customers of Movie Gallery and

Hollywood Video.  The letter noted that "[t]he complaints filed with our offices raise serious

issues about possible violation of state and federal consumer protection laws (including our

unfair and deceptive acts and practice laws) and laws relating to fair debt collection laws and

credit reporting laws."  Among other things, the Attorneys General requested that all credit

reporting cease and that the Liquidating Trustee "[a]dvise the third-party collection agencies that

they are not authorized to seek to collect or return amounts from the consumer in excess of the

debts recorded on Hollywood Video's books."

64.    CCS did not inform the Debtors or the Liquidating Trustee of the magnitude of

the consumer disputes or of all of the Attorney General inquiries in October and November 2010.

65.    Further, though CCS was aware of the high number of consumer complaints and

some of the Attorney General inquiries in October and November 2010, it did not -- until

January 2011 -- instruct NCS to cease or modify the credit reporting CCS knew NCS was doing.

18

66.     A January 12, 2011 email sent by Bruce Shapiro of CCS to CCS executives indicates that CCS' concern was not about NCS' unlawful collection efforts, but rather with the amount of CCS' projected profit from NCS' work. In that email, Mr. Shapiro wrote:

> I am concerned with the recoveries from NCS/NCR on the Hollywood Video and Movie Gallery accounts. If NCS/NCR does not perform on this business, the plan for the cable segment is going to be much harder to achieve.
>
> So far this month, we have posted $24.2K. The average recoveries in the plan are $210K per month. There is certainly the inventory to recovery (sic) this and more if the business is worked. In December 2010, NCS/NCR recovered $180K on these accounts. Most importantly, is it possible to get NCS/NCR to remit payment files to us on a daily basis? This way, we can track exactly how we are doing every day.

67.     Similarly, the same day, Mark Ramsdell wrote that "we need to put some heat on them [NCS] as collections are far off plan."

68.     On February 22, 2011, after the Liquidating Trustee was contacted by the Attorney General of the State of Michigan about a consumer who had been credit reported by NCS or CCS, Mr. Sand again wrote to CCS to learn whether all of the negative credit reports had been removed.

69.     As of March 31, 2011, CCS had still failed to inform the Liquidating Trustee about what accounts had been mailed collection notices since September 2010.

70.     In or about May, 2011, as a result of CCS' and NCS' activities, described above, the Liquidating Trustee entered into a Stipulation and Agreed Order (the "Stipulation") with the Attorneys General of all fifty states and the District of Columbia. The Stipulation specified certain of the Attorney Generals' objections to NCS' and CCS' collection activities concerning the Hollywood Video and Movie Gallery accounts, including:

(a)     Alleged lack of notice to consumers of the amounts allegedly owed;

4840-1687-1183.3

(b)     Negative credit reporting regarding amounts allegedly owed;

(c)     Demands for collection fees in addition to the principal amounts allegedly owed by former customers of the Debtors;

(d)     Principal amounts which the Attorneys General asserted to constitute "double charges" whereby a consumer was held responsible for both late fees and product charges for items purportedly rented;

(e)     Issues relating to the validity and/or enforceability of some or all of the Customer Accounts alleged to be due and owing, including, for example, issues relating to waiver, estoppel, and alleged lack of supporting documentation or other evidence to substantiate the alleged debts;

(f)     Consumer complaints directly challenging underlying amounts alleged to be due and owing; and

(g)     Issues relating to the collection tactics used by CCS and/or NCS with respect to their efforts to collect the Customer Accounts.

To resolve the Attorney Generals' complaints, so that the Liquidating Trustee could proceed with efforts to collect the Customer Receivables in a lawful manner, the Liquidating Trustee agreed in the Stipulation, among other things: (i) that the Trust would not engage in any future credit reporting or permit any collection agencies to threaten adverse credit reporting; (ii) that no collection fees or interest charges could be added to the principal debt amounts owed by consumers; (iii) that the Trust would not collect both product charges and late fees for any single rental transaction, but only the lesser of the two; and (iv) that the Trust would not collect any stand-alone product charges. A true and accurate copy of the Stipulation is attached as Exhibit J hereto. The negotiation between the Trust and the various Attorneys General over the terms of the Stipulation were complex and time-consuming, and the Trust incurred over $200,000 in legal fees related to negotiating and implementing the Stipulation.

71.    As a result of NCS' and CCS' collection activities, the Liquidating Trustee's ability to collect the Customer Receivables has been significantly delayed, impeded and diminished.

20

72. As a result of NCS' and CCS' collection activities, the realizable value of the Customer Receivables has been substantially diminished.

73. Each of the defendants is jointly and severally liable to the Liquidating Trustee for the damages caused by NCS' conduct.

**Impact of CCS' and NCS' Conduct on the Value to be Realized from Customer Receivables**

74. As a result of 1) the Stipulation precluding, among other things, the Trust from utilizing credit reporting to collect the Customer Receivables, and 2) the resulting delay and related additional aging of the Customer Receivables caused by CCS' and NCS' conduct, the amount of Customer Receivables the Trust can collect has been damaged in an amount to be determined at trial, of the aggregate amount of debt not less than $8 million.

75. CCS' and NCS' conduct directly caused the Trust to enter into the Stipulation.

76. CCS and NCS are jointly and severally liable to the Trust for the damages and attorneys fees incurred by the Trust as a result of NCS' conduct.

77. CCS is additionally liable to the Trust for the damages caused and attorneys fees incurred by the Trust as a result of CCS' conduct.

## COUNT I
## BREACH OF CONTRACT BY CCS

78. The Liquidating Trustee repeats and realleges the allegations contained in Paragraphs 1 through 77 herein as if fully reincorporated herein.

79. CCS' conduct in failing to comply with all applicable laws and in failing to monitor and supervise NCS, which also engaged in unlawful conduct, and CCS' failure to ensure that NCS complied with all applicable laws, constitutes a breach of the CCS Agreement.

21

80.     In or about February 2011, the Liquidating Trustee served a notice on CCS asserting its entitlement to indemnification for the damages to the value of the Trust's portfolio of Customer Receivables and for the attorneys fees incurred, and to be incurred, by reason of CCS' and NCS' collection activities, as described above.

81.     CCS has failed and refused to respond to the Liquidating Trustee's demand for indemnity.

82.     As a result of CCS' breach, and/or its wrongful acts, negligent errors and omissions and/or those of NCS, CCS is liable to the Liquidating Trustee for the damages to the Trust's portfolio of the Customer Receivables in an amount to be determined at trial, but not less than $8 million dollars.

83.     In addition, as a result of the inquiries from the Attorneys General concerning NCS' and CCS' collection activities, described above, the Trust has incurred at least $200,000 in attorneys fees and costs in responding to those inquiries. Pursuant to the CCS Agreement, CCS is additionally liable to the Liquidating Trustee for the attorneys fees, costs and expenses the Trust incurred as a result of CCS' and NCS' conduct, in an amount to be determined at trial but not less than $400,000.

## COUNT II
### INDEMNIFICATION PURSUANT TO NCS AGREEMENT

84.     The Liquidating Trustee repeats and realleges the allegations contained in Paragraphs 1 through 83 as if fully reincorporated herein.

85.     Pursuant to the NCS Agreement, NCS agreed to and was obligated to indemnify CCS, and customers of CCS, for, among other things, the damages, costs and expenses, including attorneys fees, arising out of NCS' performance of collection activities on the Hollywood Video and Movie Gallery accounts.

22

86.     The Trust was a customer of CCS, such that NCS is obligated to indemnify the Trust for the damages and attorneys fees it incurred as a result of NCS' conduct in collecting on the Hollywood Video and Movie Gallery accounts.

87.     Accordingly, NCS is liable to the Trust for the damages to the value of the Trust's portfolio of Customer Receivables caused by NCS' collection activities, in an amount to be determined at trial but not less than $8 million.

88.     NCS is additionally liable to the Trust for the attorneys fees, costs and expenses the Liquidating Trustee has incurred as a result of NCS' collection activities, in an amount to be determined at trial, but not less than $400,000.

89.     CCS is jointly and severally liable to the Trust for any damages caused by and/or attorneys fees incurred as a result of NCS' conduct.

## COUNT III
## THIRD PARTY BENEFICIARY CLAIM AGAINST NCS

90.     The Liquidating Trustee repeats and realleges the allegations contained in Paragraphs 1 through 89 as if fully reincorporated herein.

91.     As the customer of CCS, the Trust is an intended beneficiary, and the primary beneficiary, of the NCS agreement, and of NCS' agreement to indemnify CCS and CCS' customers. The Trust was the only customer CCS had that was to benefit from NCS' performance under the NCS Agreement.

92.     CCS subcontracted collection of the Hollywood Video and Movie Gallery accounts to NCS in exchange for NCS' agreement to pay CCS a portion of the amount which NCS collected on these accounts. In turn, CCS forwarded, or was to forward, at least half of the monies it received from NCS to the Trust.

23

4840-1687-1183.3

93.    As a result of NCS' breach of the NCS Agreement, NCS is liable for the damages caused by its conduct to the Trust, which is an intended and primary third-party beneficiary of the NCS Agreement.

94.    NCS' collection activities breached the CCS Agreement, and damaged the value of the Trust's portfolio of Customer Receivables in an amount to be determined at trial but not less than $8 million.

95.    NCS' breach additionally caused the Liquidating Trustee to incur attorneys fees and costs in an amount to be determined at trial, but not less than $400,000.

WHEREFORE, the Liquidating Trustee seeks judgment against Defendants as follows:

    (a)    On Count I, for judgment against CCS for (i) the damages caused to the value of the Trust's portfolio of Customer Receivables in an amount to be determined at trial, but not less than $8 million; and (ii) for the attorneys' fees, costs and expenses the Trust has incurred by reason of CCS' and NCS' collection activities in an amount to be determined at trial, but not less than $400,000;

    (b)    On Count II, for judgment against NCS and CCS, jointly and severally, for (i) the damages caused to the value of the Trust's portfolio of Customer Receivables in an amount to be determined at trial, but not less than $8 million; and (ii) for the attorneys' fees, costs and expenses the Trust has incurred by reason of NCS' collection activities in an amount to be determined at trial, but not less than $400,000;

    (c)    On Count III, for judgment against NCS for (i) the damages caused to the value of the Trust's portfolio of Customer Receivables in an amount to be determined at trial, but not less than $8 million; and (ii) for the attorneys' fees, costs and expenses the Trust has incurred by reason of NCS' collection activities in an amount to be determined at trial, but not less than $400,000; and

    (d)    For such other and further relief as to the Court is fair, just and proper.

24

Dated: April 17, 2012
Richmond, Virginia

Respectfully submitted,

**KUTAK ROCK LLP**
By: /s/ Michael A. Condyles
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone: (804) 644-1700
Fax: (804) 783-6192

and

**SEYFARTH SHAW LLP**
Christopher J. Carolan (admitted *pro hac vice*)
Gregory R. Yates (admitted *pro hac vice*)
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 218-3356
Fax: (917) 344-1281

and

**K&L GATES LLP**
John A. Bicks (NY 2032498) (admitted *pro hac vice*)
Lani A. Adler (NY 1860543)
599 Lexington Avenue
New York, New York 10022-6030
Telephone: (212) 536-3900

*Attorneys for Corliss Moore & Associates, LLC,*
*solely in its capacity as Liquidating Trustee for the*
*First Lien Term Lenders Liquidating Trust*

25



## CCS COLLECTION AGREEMENT

AGREEMENT made as of the 13th day of September, 2010 ("Agreement") between Credit Control Services, Inc., a Delaware Corporation with headquarters located at Two Wells Avenue, Newton, Massachusetts 02459 (hereinafter referred to as "CCS") and Hollywood Entertainment Corporation, a Virginia corporation, and Movie Gallery US, LLC, a Delaware limited liability company, located at 9275 S.W. Peyton Lane, Wilsonville, OR 97070 (hereinafter collectively referred to as "Client").

CCS is engaged in providing services in the collection of debts, and Client desires to obtain such services. Accordingly, the parties hereto agree as follows:

1.      CCS will attempt to collect accounts due to Client that Client, at its sole discretion, chooses to refer to CCS. CCS shall utilize its best efforts, in a commercially reasonable manner and in compliance with all applicable laws, to collect accounts referred by Client. As part of its recovery process, CCS will report accounts to one or more of the three major credit bureaus.

2.      At its sole discretion, Client may withdraw at any time and for valid business reasons any account referred to CCS. CCS will immediately cease its collection efforts with respect to any such balance upon receipt of a notice of withdrawal.  CCS shall be entitled to compensation on a withdrawn account only with respect to (a) funds actually recovered by CCS prior to receipt of a notice of withdrawal or (b) funds actually recovered by Client after receipt by CCS of notice of withdrawal where CCS has obtained a written executed repayment agreement from the account debtor prior to CCS' receipt of a notice of withdrawal and so long as Client does not have to reinstate collection procedures to collect the amount to be repaid.

3.      CCS may utilize its vendor network to expedite the process and/or facilitate listing small balanced accounts.  CCS agrees that no account shall be referred to an attorney, no suit shall be commenced and no expense chargeable to Client shall be incurred without Client's specific authorization.  Notwithstanding, the fees set forth in Attachment A, if any, shall apply in the event of such authorization.

4.      Each of Client and CCS agrees (i) to reimburse and make the other whole on account of any breach of the Agreement or by its negligent error or omission and/or wrongful act; and (ii) to indemnify and hold the other harmless from any and all judgments, fines and penalties, amounts paid in settlement, damages, claims, causes of action and reasonable costs and expenses, including attorneys fees and expenses, which the other may pay or incur as a result of a breach of the Agreement or caused in whole or in part as a result of a negligent error or omission and/or wrongful act of the other.

5.      The sole compensation for CCS and its retained attorneys for their services hereunder is set forth in Attachment A. The amounts are due whether payment is received by CCS or made directly to Client. Where an account is reduced or offset as a result of application of credits due to audits, adjustments, dividends, counterclaims or for any other reason, CCS shall receive compensation only on those amounts actually recovered and paid to Client

1

and shall not receive compensation on those amounts by which the account is reduced or offset. In addition, CCS shall not be entitled to a fee on any account paid to CCS or Client if the account to which such payment relates has not been previously referred to CCS. Amounts recovered by CCS on any account referred to CCS under this Agreement shall be paid over to Client no later than thirty (30) calendar days following the date of recovery. All payments will be sent to the following address:

> Movie Gallery, Inc.
> 9275 S.W. Peyton Lane
> Wilsonville, OR 97070
> Attn: Wes Sand

In the absence of the information stated above, remittances will be forwarded to the attention of the Finance Department at the Client address shown in the preamble to this Agreement. Amounts recovered by CCS and paid to Client shall be accompanied by an accounting which sets forth the debtor account name, the amount recovered by CCS, the amount of compensation owed by Client to CCS on the account recovered, the amount of compensation retained by CCS and the net amount remitted by CCS to Client. Payment to Client of amounts recovered by CCS may be net of fees due.

6.   The fee schedule set forth in Attachment A shall remain in full force and effect during the entire term of this Agreement or until amended pursuant to the terms of this Agreement. The parties may authorize deviation from this fee schedule on an individual account provided the parties approve the deviation in writing. The fees set forth are based on current postal rates. In the event that the postal rates should increase in any given year, CCS may adjust its fees proportionately. The fees set forth are based on the account data provided by client in connection with the client intake. Should the actual accounts placed deviate from the data previously provided, the parties shall negotiate in good faith to adjust the fees accordingly.

7.   In order to avoid duplication of effort and possible inconvenience to Client's customers whose accounts have been placed with CCS, Client shall promptly report to CCS any amounts paid directly to Client.

8.   Title to the accounts referred to CCS under the terms of this Agreement remains with Client.

9.   This Agreement shall become effective on the date first written above and will continue in effect until terminated by either party for any reason. A party may terminate this Agreement by providing the other party with thirty (30) days written notice. If CCS or Client should give such thirty (30) day notice, accounts referred prior to the termination date shall remain with CCS for collection for six (6) months (hereinafter the "Wind-up Period") following the termination date. Upon termination of this Agreement, CCS shall return to Client all records and files relating to the accounts referred to CCS prior to the termination date of this Agreement.

10.  With respect to compensation of CCS and its retained attorneys after either party has

2

provided notice of termination of this Agreement, CCS and its retained attorneys shall be compensated in accordance with the fee schedule as set forth in Attachment A. In addition, CCS will be compensated in accordance with the fee schedule set forth in Attachment A on funds actually recovered on referred accounts after the running of the Wind-up Period where CCS' efforts resulted in a written, executed repayment agreement from the debtor prior to the end of the Wind-up Period and so long as Client does not have to reinstate collection procedures to collect the amount to be repaid.

11.   Each party hereto agrees that any information, records, studies and trade practices revealed or shared with or generated by the other is highly sensitive and strictly confidential, regardless of whether or not the information is labeled as being confidential. Each party hereto will maintain such information in a strictly confidential manner and shall use its best efforts to avoid disclosure of the confidential information to third parties, which efforts shall be, at a minimum, the same degree of care as is exercised by the party receiving such confidential information in respect of its own proprietary information.

Each party hereto shall strictly limit its disclosure of the confidential information only to those of the party's employees or agents who have a need to review the information for the purposes set forth herein. Each party hereby certifies to the other that all such employees or agents who will receive or review any confidential information shall be advised of agree to be bound by this duty to avoid disclosure in advance of receiving any confidential information.

This confidentiality obligation shall not apply to confidential information that:

  a.  was already in the receiving party's possession at the time of disclosure thereof by the other;
  b.  is or later becomes part of the public domain or public knowledge;
  c.  is received from a third party having no obligations of confidentiality;
  d.  is required by law or regulation to be disclosed. In the event that information is required to be disclosed pursuant to this subsection d., the party required to disclose the confidential information shall timely notify the other to allow it to assert whatever exclusions or exemptions may be available to it under such law or regulation.

12.   To the best of Client's actual knowledge or abilities, Client certifies to CCS as follows:

  a.  that it will not forward or place any accounts where Client has received notice that the debtor or any other responsible party has filed for bankruptcy protection or is otherwise subject to any sort of statutory or common law protection from creditors. Further Client will immediately notify CCS in the event that Client subsequently receives notice of or otherwise learns that debtor is subject to such protections; and;
  b.  that statute of limitations that will apply to the accounts will be that of a contract not-under-seal for the jurisdiction where the debtor resides unless the Client advises otherwise;

3

    c. that any and all telephone numbers provided to CCS were given to Client by
the debtor or Client otherwise has received consent from the debtor to use the
numbers provided.

    d. that all account and other data furnished to CCS shall be accurate. Client shall
immediately update CCS in the event that Client determines that any data is
not accurate. Further, by transmitting accounts to CCS, Client certifies that it
has available and can produce to CCS within a reasonable period of time any
and all documents that support Client's claims that the debtor listed for the
account is obligated for the amount placed.

    e. that the debtor listed on the account is legally responsible for payment of the
debt.

13.    The parties agree that CCS is an independent contractor retained by Client for the
services described herein and that nothing herein is intended to make CCS an employee,
agent, partner or joint venturer of Client.

14.    During the term of this Agreement, CCS agrees to procure and maintain in effect, in
customary forms and coverage amounts, all types of insurance which are standard in its
industry. CCS shall provide evidence of such insurance upon request by Client.

15.    This Agreement shall be governed by the laws of the Commonwealth of Massachusetts,
irrespective of any conflicts or choice of law analysis. Should any court of competent
jurisdiction declare any provision of this Agreement illegal or invalid, the validity of the
remaining parts, terms, or provisions shall not be affected thereby.

16.    This Agreement sets forth the entire Agreement between the parties hereto and there are
no agreements, inducements, arrangements or understandings oral or written, between
them that are not fully expressed herein. Neither this Agreement nor any provision
hereof may be changed, waived, discharged or terminated orally, but only by written
Amendment executed by authorized representatives of CCS and Client.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first
written above.

CREDIT CONTROL SERVICES, INC.        HOLLYWOOD ENTERTAINMENT
                                CORPORATION and MOVIE
                                GALLERY US, LLC

By:                            By:
(Signature)                          (Signature)

    Mark P. Ramsdell                Wesley D. Sand
(Print name)                          (Print name)

Its (Print title)  Chief Operating Officer  ,     Their (Print title) President and COO,
duly authorized                        duly authorized

**ATTACHMENT A**

*THE*

# |C|C|S|

**COMPANIES**

## APPLICABLE CONTINGENCY FEE BASED ON DOLLARS RETURNED TO CLIENT

|  | <$3MM | $3-5MM | $5-7MM | >7MM |
|---|---|---|---|---|
| Amounts < $50.00 | 50% | 55% | 60% | 65% |
| Amounts $50.00 - $75.00 | 40% | 45% | 50% | 55% |
| Amounts $75.00 - $100.00 | 35% | 40% | 45% | 50% |
| Amounts > $100.00 | 32% | 35% | 40% | 45% |

Should the client withdraw an account(s) after placement a $0.75 per unit charge will apply. This cost will be netted from recoveries and/or billed to the client directly.

Should the client receive a direct payment and/or settle an account(s) directly, the applicable contingency fee will apply.

---

**CREDIT COLLECTION SERVICES**
Two Wells Avenue
Newton, MA 02459
(617) 965-2000

---

6

CCS050708



*Evans Depo.*
*EX # 7*



### National Credit Solutions Client Agreement

AGREEMENT made this 10th day of October 2010 between Credit Control Services, Inc. and its subsidiaries and affiliates (hereinafter "Client") and NATIONAL CREDIT SOLUTIONS of Oklahoma City, Oklahoma (hereinafter the "Company").

WHEREAS, the Company is engaged in the business of providing services in the collection of delinquent accounts; and

WHEREAS, CLIENT desires to obtain such services;

NOW THEREFORE, the parties to this Agreement, in consideration of the mutual covenants and stipulations set out, agree as follows:

1.  This Agreement will become effective upon October 10, 2010 and will continue in effect until terminated by either party in the manner set forth herein.

2.  The Company will reasonably attempt to collect all referred balances. Referred balances as used herein and in any exhibits hereto is any outstanding balance owed on an account owned or serviced by CLIENT which is referred by CLIENT to the Company for collection.

3.  CLIENT will have the right to withdraw any referred balance from the Company for any reason, and upon such withdrawal, the Company will cease its collection efforts with respect to any such balance. A fee of $1.50 per account will be charged for withdrawal within 3 months of initial letter or within 2 months of any additional letter mailed to consumer for whichever period is longer.

4.  The Company will not forward any referred balance to an attorney for handling without first obtaining the prior written authorization of CLIENT.

5.  The company will not report or forward to any Credit Reporting Agency any information relative to CLIENT accounts without first obtaining the prior written authorization of CLIENT.

6.  In performing its collection efforts pursuant to this Agreement, the Company will comply with:

    ▪ all applicable laws and regulations of the state jurisdictions in which the Company may operate on CLIENT behalf; and

    ▪ the provisions of The Fair Debt Collection Practice Act and all other applicable federal laws.

-1-

**EXHIBIT**

*7*

*Evans*

CCS03549

### National Credit Solutions Client Agreement

7.   The Company agrees to INDEMNIFY and hold CLIENT (including customers of CLIENT) harmless from and against any claims, damages, costs, and expenses, including reasonable attorney fees, arising out of the acts, errors or omissions of the Company, or its agents or employees, in the performance of its obligations under this Agreement.

8.   Except as otherwise provided in §13.b of this Agreement, the Company will pay CLIENT any and all amounts recovered by the Company on any referred balance no later than thirty (30) days following the "date of recovery". The term "date of recovery" as used herein is the date upon which the Company receives a check or other form of payment of a referred balance.

Before remitting payment of such recovered amounts to CLIENT, the Company may deduct from such amounts those fees owed to it by CLIENT under §9 of this Agreement, except as otherwise provided in §13.b of this Agreement.

9.   The Company will be compensated for its collection efforts in accordance with the fee schedule attached hereto as **Exhibit A**. Any deviation from this fee schedule on an individual account because of extraordinary expense, such as, but not limited to, attorney involvement, must be separately and individually approved by CLIENT prior to incurring the expense.   No additional compensation will be payable to the Company under this Agreement unless agreed to in writing by the parties hereto.

10.   The Settlement Authority of the Company is shown on **Exhibit B**.

11.   Title to the referred balances will remain with CLIENT.   CLIENT reserves the right to periodically audit the referred balances.   The Company will cooperate with CLIENT in its performance of any such audit including, but limited to, by making available records requested by CLIENT.

12.   CLIENT provides Company with access to its confidential information related to its debtors, agents and business practices and other information.   All information to which Company has access will be deemed to be "Confidential Information" under this §12.

Company agrees to treat and hold all such Confidential Information in strict confidence and to afford such information the same high degree of care, confidentiality and discretion as Company uses with respect to its own confidential information.   Company agrees not to disclose or permit the disclosure of any Confidential Information to any third party or to use the Confidential Information to the detriment of CLIENT.   Company further agrees not to use the Confidential Information for any purpose other than performing its duties under this Agreement with CLIENT.

-2-

CCS03550

## National Credit Solutions Client Agreement

Notwithstanding the foregoing, Company may only disclose Confidential Information where CLIENT otherwise consents to such disclosure in writing.

If Company or any of its directors, officers or employees become legally compelled (by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, Company shall provide CLIENT with prompt notice thereof so that CLIENT may seek a protective order or other appropriate remedy. Company agrees to use its best efforts to obtain or assist CLIENT in obtaining such a protective order or other appropriate remedy.

Any breach by Company of its obligations hereunder would result in irreparable injury to CLIENT. In seeking enforcement of any of Company's obligations hereunder, CLIENT will therefore be entitled (in addition to all other remedies) to seek injunctive and other equitable relief to prevent or restrain the breach of the Agreement.

At the request of CLIENT, Company will promptly return to CLIENT and/or destroy all Confidential Information and any other manifestation containing or reflecting such Confidential Information, including, without limitation, all data bases created containing such information. In the event that CLIENT requests Company to destroy the Confidential Information and any related manifestations thereof, Company shall certify to CLIENT in writing that such Confidential Information and any related manifestations thereof have been destroyed.

13.   Termination.

a.   Except as provided in §13.b of this Agreement, either party may terminate this Agreement for any reason upon mailing or delivering thirty (30) days prior written notice to the other party.

Notwithstanding termination of the Agreement by either party under this §13.a, the Company will continue its collection efforts on any referred balances that are forwarded prior to the date upon which the terminating party sends its notice of termination to the other party (hereinafter "notice date"). The Company will continue its collection efforts on such referred balances for a period of thirty (30) days from the notice date. After such thirty (30) day period has run, the Company will cease its collection efforts under this Agreement and provide CLIENT with a list of any remaining referred balances which the Company has not collected in full. The company will specify the account number or any referred balance included on such list. In accordance with the terms of Exhibit A, CLIENT will continue to pay the Company compensation on such referred balances that the Company collects after termination.

-3-

CCS03551

### National Credit Solutions Client Agreement

Notwithstanding termination of the Agreement by either party under this §13.a, any referred balances which the Company has forwarded, with CLIENT authorization, to an attorney for handling will remain with the Company until such referred balances are paid by the owing debtor or otherwise closed by the Company. In accordance with the terms of Exhibit A, CLIENT will continue to pay the Company compensation for any amounts collected on such referred balances forwarded to an attorney.

b. Notwithstanding any other provision of this Agreement, to the contrary, if the Company violates the provisions of §6 and/or §8 of this Agreement, CLIENT may terminate this Agreement by providing written notice to the Company. In the event of termination under this §13.b:

- the Company will cease its collection efforts with respect to any and all remaining referred balances;

- the Company will provide CLIENT with a list of any remaining referred balances which the Company has not collected in full, and Company will specify on such list the account numbers of such remaining referred balances;

- the Company will forward any amounts it may receive on any referred balances immediately to CLIENT without deducting any sums therefrom; and

- CLIENT will not pay any fee or other compensation to the Company for any amount recovered and/or collected on any referred balance.

14. **Notice.** Any notices or communications required to be given under this Agreement will be in writing and sent postage prepaid, certified mail, return receipt requested, to the other party at the address listed below:

If to CLIENT:     Credit Control Services, Inc.
                  2 Wells Ave
                  Newton MA 02459

If to Company:    National Credit Solutions
                  3680 E I 240 SVC RD
                  Oklahoma City, OK 73135

15. **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of Oklahoma.

16. **Entire Agreement.** This Agreement and any attached exhibit(s) constitute the entire Agreement between the parties relating to the matters contained herein and

CCS03552

National Credit Solutions Client Agreement

supersede all previous communication, representations or agreements, either oral or written, with respect to the subject matter hereof.

17.   **Assignability.** This Agreement cannot be sold, transferred or assigned by either party hereto without the prior written consent of the other party. This Agreement will be binding upon, inure to the benefit of and be enforceable by the respective successors and permitted assigns of the parties.

18.   **Waiver.**   The failure of either party to this Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of any of the terms and conditions of this Agreement, will not be construed as thereafter waiving any such terms and conditions, all of which will continue and remain in full force and effect as if no such forbearance or waiver had occurred.

19.   **Amendments.**   This Agreement and any exhibits hereto may be amended, modified or supplemented only by written agreement signed by both parties.

20.   **Titles.** The headings used herein are descriptive only and do not alter, modify or vary the terms of this Agreement.

21.   **Arbitration of Disputes.** The parties hereto, on behalf of themselves and their respective officers, directors, employees, agents, successors and assigns, hereby agree that if they cannot resolve any dispute or claim relating to, or arising out of, this Agreement, the dispute or claim shall be decided solely and exclusively by final and binding arbitration. The arbitration shall be conducted pursuant to the rules of the National Credit Solutions and within ten (10) miles of the corporate offices of National Credit Solutions. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVE THEIR RIGHT TO A TRIAL BY JURY.

CCS03553

## National Credit Solutions Client Agreement

IN WITNESS WHEREOF, the parties have executed this Agreement on this 1st day of
June 2010.

NATIONAL CREDIT SOLUTIONS

_____          *10·10·2010*
Brett Evans, Managing Partner        Date

Credit Control Services, Inc.

_____          *Oct-10-10*
Title  *C.O.O.*                      Date

-6-

CCS03554

## National Credit Solutions Client Agreement

Exhibit A:

Fee Schedule

Warehouse Accounts – Credit Report Only
CLIENT will pay a _15_% contingency fee on all principal dollars collected on assigned accounts. Client allows any fees or interest over the principal amount. All fees and/or interest over the principle will be 100% company.

Lettered Accounts – Accounts lettered and credit reported
CLIENT will pay a _25_% contingency fee on all principal dollars collected on assigned accounts. Client allows any fees or interest over the principal amount. All fees and/or interest over the principle will be 100% company.

Exhibit B:

Settlement Authority

CLIENT will extend a blanket 50% settlement authority to Company. Any recommended settlements greater than 50% will need to be presented to CLIENT for review and approval. Example ($100 balance cannot have a settlement lower than $50.00 without authorization)

CCS03555



From:           kminolta@ccsusa.com
Sent:           Wednesday, August 25 2010 11:27 28 AM
To:             Lynch, Andrew
Subject:        Hollywood Video Customer Agreement 2
Attachments:    SKMBT_C20310082515270.pdf

CCS051253

# M.G.A., INC. (Company)
## MEMBERSHIP AGREEMENT
### (Applicants Must be At Least 18 Years of Age)

DATE: _____

MEMBERSHIP #: _____

DATA VERIFICATION
MOD Initials: _____
Date Verified: _____

FIRST NAME: _____  MIDDLE: _____  LAST: _____

HOME PHONE: _____  WORK PHONE: _____

ADDRESS: _____  CITY: _____

ZIP/POSTAL CODE: _____  E-MAIL ADDRESS: _____  STATE/PROVINCE: _____

EMPLOYER: _____

PRIMARY ID:
[ ] VALID STATE-ISSUED DRIVERS LICENSE   [ ] VALID STATE-ISSUED I.D.   [ ] MILITARY ID
NUMBER: _____  EXPIRATION DATE: _____  STATE/PROVINCE: _____

SECONDARY ID:
[ ] MASTERCARD   [ ] VISA CARD   [ ] AMERICAN EXPRESS (If Accepted)   [ ] DISCOVER CARD (If Accepted)
CREDIT CARD NUMBER: _____  EXPIRATION DATE: _____

[ ] MILITARY ID   [ ] WORK ID CARD   [ ] SCHOOL ID CARD   [ ] VALID STATE-ISSUED ID CARD   [ ] BANK CARD
[ ] OTHER ID WITH NAME AND ADDRESS  NUMBER: _____  EXP DATE: _____  STATE: _____
SOC SEC/INSURANCE # (OPTIONAL): _____  DATE OF BIRTH: _____  REEL PLAYERS? Y or N

Additional Names: Member gives the following persons permission to rent on his/her account.

NAME: _____  DATE OF BIRTH: _____  17+ RENTALS?  (Allowed or Not Allowed)

NAME: _____  DATE OF BIRTH: _____  17+ RENTALS?  (Allowed or Not Allowed)

NAME: _____  DATE OF BIRTH: _____  17+ RENTALS?  (Allowed or Not Allowed)

NAME: _____  DATE OF BIRTH: _____  17+ RENTALS?  (Allowed or Not Allowed)

HOW DID YOU HEAR ABOUT M.G.A., INC.?
[ ] DIRECT MAIL   [ ] NEWSPAPER   [ ] WELCOME SERVICE   [ ] DROVE BY   [ ] PHONE BOOK   [ ] RADIO
[ ] BILLBOARD   [ ] TELEVISION   [ ] REFERRAL   [ ] OTHER

Member and M.G.A., INC. ("Company") enter into this agreement to allow member to rent and/or purchase products from Company and agree to the following terms and conditions.

Member shall notify Company immediately of any change in address, phone number or any other information above. Member acknowledges that Member may keep a rental item beyond the pre-paid initial viewing period under the following conditions: If a rental item is not returned by close of business on the last day of a viewing period, Member's rental of the item will be automatically extended for an extended viewing period of the same duration as the initial viewing period, and the associated rental fee ("extended viewing fee"), which will not exceed the rental fee for the initial viewing period, will be automatically charged to the membership account. If any rental item is not returned to the store where rented within the number of days (as specified below based upon the initial viewing period), the Company will automatically convert the rental to a sale and will charge the membership account the associated extended viewing fees and the cost incurred by the Company for the replacement of the rental item. Member acknowledges that Company retains the right to alter and amend its rental and pricing policies, terms and conditions. It is the policy of Company not to rent or sell movies or games designated as · · · : to persons under the age of 17 without the including all movies rated "R" by the Motion Picture Association of America and all video games rated "M" by the Entertainment Software Rating Board. It is the policy of Company not to rent or sell movies or games rated "NC-17" by the Motion Picture Association of America or Games rated "Adults Only" by the Entertainment Software Rating Board to persons aged 17 or under.

| Initial Viewing Period | Rental Converted to sale on |
|---|---|
| 1-Day Rental | Day 15 after the initial rental date |
| 2-Day Rental | Day 16 after the initial rental date |
| 5-Day Rental | Day 17 after the initial rental date |
| 7- Day Rental | Day 23 after the initial rental date |

Company reserves the right, at any time and without notice, to change rental rates and to amend the terms and conditions of membership. MEMBER ACKNOWLEDGES AND ACCEPTS FULL RESPONSIBILITY AND GUARANTEES PAYMENT FOR ALL ITEMS RENTED THROUGH THE USE OF THE MEMBERSHIP CARD, WHETHER OR NOT SUCH USE IS AUTHORIZED BY MEMBER. Member further agrees that Company may pursue all avenues of collection; authorizes Company to prepare and submit credit charge slips using any of the charge cards listed above and authorizes its payment by the credit card company without Member's signature to recover any of the charges mentioned above. MEMBER AGREES TO HOLD Company AND ITS EMPLOYEES HARMLESS FROM ANY DAMAGE OR LOSS TO ANY PERSON(S) OR PROPERTY IN ANY WAY ARISING OUT OF OR DURING THE USE OF ANY RENTED OR PURCHASED ITEM, including but not limited to, materials rented using Member's membership card and materials viewed when rented or sold on Member's account.

By signing, Member agrees in full to the terms and conditions of this document.

MEMBER SIGNATURE _____  DATE _____

STORE ASSOCIATE _____  DATE _____

CCS051254



| From: | kminolta@ccsusa.com |
|---|---|
| Sent: | Wednesday, August 25 2010 11:27:39 AM |
| To: | Lynch, Andrew |
| Subject: | Hollywood Video Customer Agreement 1 |
| Attachments: | SKMBT_C203100825152711.pdf |

CCS051251

**CONTRACT TERMS AND CONDITIONS** (When signed by Applicant and accepted by Hollywood Video)

A. Member agrees to notify Hollywood of any change to Member's address, telephone number or other application information. Member agrees to be responsible for and guarantee payment to Hollywood of all charges made through the use of Member's membership account whether by Member or Additional Member and including any unauthorized use or Member's card until Member reports the card as lost or stolen by calling 1-800-HOLLYWOOD (not applicable when prohibited by law).

B. Product is to be used for the same of days specified at the time of rental ("rental period")...

C. Member agrees that any returned check is subject to a redeemed check fee...

D. Member agrees that, unless expressly prohibited by law, any disputes arising...
American Arbitration Association, including its Commercial Due Process Protocol. The Federal...
CONSTITUTES THE WAIVER OF THE RIGHT TO GO TO COURT (EXCEPT FOR MATTERS...
IN COURT AND INVOKE ARBITRATION, AND THE RIGHT TO SUE FOR PUNITIVE DAMAGES...
arbitration procedures by visiting the American Arbitration Association website (www.adr.org).

E. Should any provision of this agreement be determined to be invalid, unenforceable or otherwise contrary to law, the parties agree that the offending provision shall be severed and the remaining provisions of the agreement shall be deemed valid and enforceable. Hollywood may change the TERMS AND CONDITIONS of this contract at any time and any new terms and conditions shall be effective upon the first rental after any change. Member may obtain a copy of all current terms and conditions by calling 1-800-HOLLYWOOD or by requesting a copy from your local Hollywood Video store.

F. Hollywood Video needs your personal information to ... business...
subject to sale of video products rental or purchased for the exclusive purpose of marketing goods and services directly to members. Hollywood may provide membership data in business affiliates and others incident to the ordinary course of its business, including for purposes of debt collection, membership account maintenance and marketing. Members who do not wish their membership information to be shared with their partners who do not wish to receive other, promotional...

All rights reserved. © 2002 Hollywood Entertainment Company

CCS051252



Cc: Sands, Steven; Shapiro, Bruce
Subject: RE: Collection Company NCR/NCS

Sent from my Verizon Wireless BlackBerry

About how many days does it take from when CCS closes the account for me to NCR being updated? I found this issue when customers were checking to confirm the collection was removed. If I can tell them it takes a week or whatever that would help. Any recommendations would be appreciated.
Thank you.
Lynn

From: Wes Sand <SandW@hlyw.com>
Date: Fri, 10 Dec 2010 08:21:00 -0800
To: Lynch, Andrew<Alynch@ccstsa.com>
Cc: Lynn Fletcher<FletcherL@hlyw.com>; Sands, Steven<SSands@ccstsa.com>; Shapiro, Bruce<Bshapiro@ccstsa.com>
Subject: RE: Collection Company NCR/NCS

Thanks. Their seemed to be confusion with our Acct Mgr at CCS as she told Lynn she wasn't familiar with this company.
Regards
Wes

From: Lynch, Andrew [mailto:Alynch@ccstsa.com]
Sent: Friday, December 10, 2010 8:08 AM
To: Wes Sand
Cc: Lynn Fletcher; Sands, Steven; Shapiro, Bruce
Subject: RE: Collection Company NCR/NCS

Good morning Wes,

This is indeed the firm to whom we outsourced. Lynn can continue to communicate with CCS on any/all matters. We are in constant contact with our partner to update the accounts.

From: Wes Sand [mailto:SandW@hlyw.com]
Sent: Thursday, December 09, 2010 8:34 PM
To: Lynch, Andrew
Subject: FW: Collection Company NCR/NCS

Is this an organization you are familiar with?
Your team has been quite helpful, but no one on our end knows why another agency would be collecting these debts.

From: Lynn Fletcher
Sent: Thursday, December 09, 2010 5:32 PM
To: Wes Sand
Subject: Collection Company NCR/NCS

CCS048887

I've been talking to a few customers and trying to help them resolve collections against them and ran across something strange.  CCS has cancelled collections for me, but it looks like there is another company out there reporting and trying to collect on our accounts

I've found the company that actually reported to these customers credit bureau is NCR (National Credit Recovery) and/or NCS (National Credit Solutions).  I've talked to my client services contact at CCS and they said NCR/NCS is not affiliated with CCS and they have no knowledge of them collecting.  I called NCR and asked for a client services rep, they gave me this email to write to generalmanager@nationalcreditsolutions.net.   I sent an email asking for someone to call me.

I'll let you know what I find out.

Thanks,
Lynn

Lynn Fletcher
Movie Gallery, Inc.
lfletcher1@hbww.com
503-214-4601 direct
503-214-4617 fax

CCS046888



Capital Assistance Group, LLC • CCS Commercial, LLC • ClaimAssist, LLC
Credit Control Services, Inc. • Customer Contact Solutions, LLC

From: Lynn Fletcher <Fletcher1@hyw.com>
To: Lynch, Andrew; Wes Sand <SandW@hyw.com>
Cc: Sands, Steven; Shapiro, Bruce
Sent: Mon Dec 13 17:44:41 2010
Subject: RE: Collection Company NCR/NCS
Hi Andrew,

I hope you can help with this.

File #:          Acct #

D      called me today saying she talked to NCS today and they haven't and will not clear her account and remove the collection from her credit bureau unless CCS or Hollywood send a letter on letterhead stating that she has a zero balance and the charge was an error.  NCR said if we say she did owe money, but we are clearing it off, she will still owe them for the collection (some issue about the specific wording being important).

I sent a notice to CCS Client services regarding this account on 12/8 and received confirmation that the account was closed on 12/8 from Lori Crawford.

Thanks,
Lynn.

Lynn Fletcher
Movie Gallery, Inc.
Fletcher1@hyw.com
503-214-4601 direct
503-214-4617 fax

From: Lynch, Andrew [mailto:lynch@ccsusa.com]
Sent: Friday, December 10, 2010 12:45 PM
To: Lynn Fletcher; Wes Sand
Cc: Sands, Steven; Shapiro, Bruce
Subject: RE: Collection Company NCR/NCS

Hi Lynn,

Sorry for the long delay in my response.

We update one another every day, so it is rather quick. Of course changes on a Friday would take until Monday to be reflected.

Thank you.

From: Lynn Fletcher [mailto:Fletcher1@hyw.com]
Sent: Friday, December 10, 2010 11:49 AM
To: Wes Sand; Lynch, Andrew

CCS048886

Cc: Sands, Steven; Shapiro, Bruce
Subject: Re: Collection Company NCR/NCS

About how many days does it take from when CCS closes the account for me to NCR being updated? I found this issue when customers were checking to confirm the collection was removed. If I can tell them it takes a week or whatever that would help. Any recommendations would be appreciated.
Thank you,
Lynn

Sent from my Verizon Wireless BlackBerry

From: Wes Sand <SandW@hlyw.com>
Date: Fri, 10 Dec 2010 08:21:00 -0800
To: Lynch, Andrew<Alynch@ccsusa.com>
Cc: Lynn Fletcher<FletcherL@hlyw.com>; Sands, Steven<SSands@ccsusa.com>; Shapiro, Bruce<Bshapiro@ccsusa.com>
Subject: RE: Collection Company NCR/NCS

Thanks. Their seemed to be confusion with our Acct Mgr at CCS as she told Lynn she wasn't familiar with this company.

Regards
Wes

From: Lynch, Andrew [mailto:Alynch@ccsusa.com]
Sent: Friday, December 10, 2010 8:08 AM
To: Wes Sand
Cc: Lynn Fletcher; Sands, Steven; Shapiro, Bruce
Subject: RE: Collection Company NCR/NCS

Good morning Wes,

This is indeed the firm to whom we outsourced. Lynn can continue to communicate with CCS on any/all matters. We are in constant contact with our partner to update the accounts.

From: Wes Sand [mailto:SandW@hlyw.com]
Sent: Thursday, December 09, 2010 6:34 PM
To: Lynch, Andrew
Subject: FW: Collection Company NCR/NCS

Is this an organization you are familiar with?
Your team has been quite helpful, but no one on our end knows why another agency would be collecting these debts.
Wes

From: Lynn Fletcher
Sent: Thursday, December 09, 2010 5:32 PM
To: Wes Sand
Subject: Collection Company NCR/NCS

CCS048887





**STATE OF KANSAS**
**OFFICE OF THE ATTORNEY GENERAL**

**DEREK SCHMIDT**
ATTORNEY GENERAL

FOR IMMEDIATE RELEASE
January 25, 2011

Contact: Jeff Wagaman
785-296-3459
jeff.wagaman@ksag.org

### Attorney General Schmidt warns consumers about new scam

TOPEKA  – (January 25, 2011) – Kansas consumers should be on the alert for a possible new scam, Kansas Attorney General Derek Schmidt warned today.

The attorney general's office has received numerous calls from Kansans across the state who have been contacted by an organization calling itself National Credit Solutions and purporting to be a debt collection agency. Most of the consumers who have been contacted have been contacted either by mail or by telephone. National Credit Solutions says it is contacting the consumers to collect a late fee owed by the consumer to Hollywood Video. The organization tells the consumer that the late fee was never paid and that Hollywood Video has turned the account over to National Credit Solutions for collection, and increasing the amount due. The organization then tells the consumer that the amount must be paid immediately or it will be reported on the consumer's credit report. National Credit Solutions often will also attempt to bargain with the consumer to get them to pay on the spot, accepting less than the amount to ensure payment.

However, most of the consumers who are contacted do not owe any late fee to Hollywood Video.

"This appears to be a scam," Attorney General Derek Schmidt said. "Consumers should not pay or give any information to this organization over the telephone. Instead, they should gather whatever information they can about the alleged debt and the caller and then report that to our office. We're here to help."

Consumers receiving calls or mail from National Credit Solutions attempting to collect a false debt should report the situation to the attorney general's Consumer Protection Division at 1-800-432-2310 or online at www.ksag.org.

Consider these tips when dealing with debt collection agencies:

- **Know your rights as a consumer.** Research the Fair Debt Collection Practices Act (FDCPA) so you know your rights as a consumer if a collection agency contacts you. Know that they have specific guidelines they must follow to ensure they are not using abusive, unfair, or deceptive practices to collect from consumers. Download the FDCPA for your reference at http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre27.pdf

- **Do not pay a debt unless you are absolutely sure it is your legitimate debt.**

- **Don't let anyone rush you into making a decision.** Take your time to ask questions, and gather information about the claim. Scam artists typically will not take the time to provide additional information when asked.

- **Check your credit report** on a regular basis, to avoid inaccurate information and discrepancies. The nationwide consumer reporting companies can provide a free copy of your credit report every 12 months. Go to www.ftc.gov/credit for additional information on credit reporting.

- **The Federal Trade Commission (FTC)** is responsible for enforcing the FDCPA and the Fair Credit Reporting Act (FCRA). Use all their resources available to build your knowledge of these acts and many more.

### ###



STEVE BULLOCK
Montana Attorney General
JAMES P. MOLLOY
Chief of Consumer Protection
CHUCK MUNSON
Assistant Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401

COUNSEL FOR PLAINTIFF
STATE OF MONTANA

NANCY SWEENEY
CLERK OF DISTRICT COURT
DONNA HOFFERBER
FILED BY _____
DEPUTY

2011 JAN 26  A  9: 20

MONTANA FIRST JUDICIAL DISTRICT COURT
LEWIS AND CLARK COUNTY

|  |  |
|---|---|
| STATE OF MONTANA, | Cause No. DDV 2011-85 |
| Plaintiff, | JAMES P. REYNOLDS<br>Presiding Judge |
| v. | **COMPLAINT:**<br>**UNFAIR AND DECEPTIVE**<br>**BUSINESS PRACTICES** |
| NATIONAL CREDIT SOLUTIONS,<br>LLC, | **AND**<br>**DEMAND FOR JURY TRIAL** |
| Defendant. |  |

EXHIBIT
24

The State of Montana alleges:

## PARTIES

1.    Plaintiff is the State of Montana, represented by the Attorney

General's Office of Consumer Protection within the Department of Justice.

2.      Defendant National Credit Solutions, LLC ("Defendant NCS") is incorporated in the State of Oklahoma and registered to do business in the State of Montana. Defendant NCS is engaged in the business of debt collection.

## JURISDICTION AND VENUE

3.      As alleged more specifically below, Defendant NCS is engaged in trade or commerce with respect to Montana consumers and, in doing so, has violated Montana's Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. §§ 30-14-101, et seq.

4.      The State of Montana's claims against Defendant NCS are based on Montana law, and are not based on federal law. There is no diversity of citizenship between the State of Montana and Defendant NCS. Thus, jurisdiction over this matter lies exclusively in the courts of the State of Montana; there is no federal jurisdiction.

5.      Jurisdiction and venue are proper in Lewis and Clark County pursuant to Mont. Code Ann. § 30-14-111(3).

## COUNT I

## VIOLATION OF MONTANA CONSUMER PROTECTION ACT

6.      The conduct at issue in this case arises out of consumer transactions between Montana residents and video rental outlets that formerly did business in

for late charges or other alleged charges relating to their rental transactions with Movie Gallery.

12.   Among other things, Defendant NCS has unilaterally issued adverse reports to credit bureaus about Montana consumers, based on alleged debts arising out of their transactions with Movie Gallery. The adverse credit reports have caused substantial harm to Montana consumers who had no opportunity to either pay or dispute the alleged debts. Among other consequences, the adverse credit reports have harmed consumers' credit rating.

13.   Defendant NCS has issued such adverse credit reports without first making any reasonable attempts to provide Montana consumers with fair notice of the alleged debts upon which the adverse credit reports are based.

14.   After issuing the adverse credit reports, Defendant NCS has not provided fair notice to Montana consumers that the adverse credit reports were issued, or the basis of the alleged debt upon which the adverse reports were based.

15.   When consumers learn about, and then contact Defendant NCS about the adverse credit reports, Defendant NCS demands payment of exorbitant, unreasonable, and unconscionable charges that are disproportionate to any amount that could properly have been demanded by Movie Gallery relating to any alleged late charge or other charge that the consumer may have incurred at Move Gallery before it closed its stores.

COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 4

16.     Upon information and belief, many of the alleged debts that form the basis for Defendant NCS's collection actions are not valid.  For example, upon information and belief, in many cases, the consumer has been charged for having failed to return a movie when in fact the consumer had returned the movie.

17.     As part of its collection efforts, Defendant NCS unfairly and deceptively demands payment of $75.00 as collection fees, when there is no basis under Montana law for collecting such fees under the circumstances at issue with the alleged Movie Gallery accounts.

18.     Upon information and belief, many Montana consumers have paid the exorbitant, unreasonable and unconscionable charges to Defendant NCS in order to protect their credit rating.

19.     Upon information and belief, when consumers contest the alleged debt and demand substantiation of its basis, Defendant NCS usually voluntarily agrees to forego any further collection efforts, and rescind the adverse credit reports.

20.     Upon information and belief, Defendant NCS has engaged, continues to engage, and unless enjoined will in the future engage in other types of conduct relating to attempts to collect alleged and unsubstantiated debts allegedly owed by former customers of Movie Gallery.

21.     Plaintiff is responsible for enforcing Montana's Unfair Trade Practices and Consumer Protection Act.

22.   Defendant NCS is engaged, has been engaged, and/or will in the future knowingly engage in a method, act, or practice that violates Mont. Code Ann. § 30-14-103.

23.   Defendant NCS's acts and omissions are and have been deceptive within the meaning of Mont. Code Ann. § 30-14-103.

24.   Defendant NCS's acts and omissions constitute unfair business practices within the meaning of Mont. Code Ann. § 30-14-103.

25.   Defendant NCS's acts and omissions have caused economic harm to Montana consumers.

26.   It is likely that Defendant NCS will continue to commit these acts if it is not enjoined.

27.   Because Defendant NCS's actions violate Mont. Code Ann. § 30-14-103, it is in the public interest to seek injunctive and monetary relief through this action against Defendant NCS, pursuant to Mont. Code Ann. §§ 30-14-111, 131, and 142.

WHEREFORE, the Plaintiff State of Montana, by and through the Attorney General's Office of Consumer Protection within the Department of Justice, respectfully requests that this Court:

1.   Declare that Defendant NCS's acts and omissions violate Mont. Code Ann. § 30 14-103;

COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 6

2.     Grant injunctive relief to temporarily and/or permanently enjoin Defendant NCS from acting in violation of Montana's Consumer Protection Act, and to take such action as the Court deems equitable and necessary to correct any harm to Montana consumers;

3.     Enter a judgment for monetary relief against Defendant NCS in an amount sufficient to provide restitution to consumers injured by Defendant's acts and practices;

4.     Pursuant to Mont. Code Ann. § 30-14-142, fine Defendant NCS $10,000 for each willful violation of Mont. Code Ann. § 30-14-103;

5.     Pursuant to Mont. Code Ann. § 30-14-131(2), award the State its costs and attorneys fees in bringing this matter.

6.     Grant any other relief the Court deems just or proper.

DATED this 26th day of January, 2010.

                STEVE BULLOCK
                Montana Attorney General
                JAMES P. MOLLOY
                Chief of Consumer Protection
                CHUCK MUNSON
                Assistant Attorney General

                By:

                JAMES P. MOLLOY
                Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

The State hereby demands a trial by jury on all issues so triable.

DATED this 26 day of January, 2011.

By: _____
JAMES P. MOLLOY
Attorneys for Plaintiff



## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MOVIE GALLERY, INC., et al., | ) Case No. 10-30696 (DOT) |
| | ) |
| Liquidating Debtors. | ) |
| | ) |

### STIPULATION AND AGREED ORDER

This Stipulation and Agreed Order (the "Stipulation") is entered into between the First Lien Term Lenders Liquidating Trustee (the "Trustee"), on behalf of the First Lien Term Lenders Liquidating Trust (the "Trust") (each as defined in the Joint Plan of Liquidation of Movie Gallery, Inc. and Its Affiliated Debtors and Debtors in Possession (the "Plan") approved by the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") in the above-captioned cases on October 28, 2010) and the Attorneys Generals[1] of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming (the "Attorneys General", and together with the Trustee, the "Parties"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

---

[1] The term "Attorneys General" shall be used to designate not only the signatory Attorneys General of the states but also the authorized representative within any jurisdiction signatory hereto that specifies an office other than that of the Attorney General to enter into agreements concerning matters relating to consumer protection.

**WHEREAS:**

1.      Pursuant to the Plan, the Trustee is charged, among other things, with liquidating and collecting the Other Assets of the Estates. The Other Assets, as reflected on the Debtors' books and records, include accounts receivable from former customers of the Debtors related to alleged late fees and other alleged charges (collectively, the "Customer Accounts").

2.      The Trustee, in the course of implementing the Plan, engaged Credit Control Services, Inc., ("CCS"), a Delaware corporation with headquarters located in Newton, Massachusetts, to handle the collection of the Customer Accounts.

3.      CCS contracted with National Credit Solutions, LLC ("NCS") of Oklahoma City, Oklahoma to collect some of the Customer Accounts.

4.      The Customer Accounts that the Trust referred for collection to CCS involve residents of all 50 states and the District of Columbia, and total approximately 3.3 million accounts with an aggregate of more than $244,000,000.00 in face amount.

5.      The Attorneys General have raised a number of objections and concerns about the collection activities of CCS and/or NCS involving the Customer Accounts, and have also expressed concerns as to certain other issues related to the Customer Accounts. These objections and concerns include, but are not necessarily limited to:

   a.     Alleged lack of notice to consumers of the amounts allegedly owed;

   b.     Negative credit reporting regarding amounts allegedly owed;

   c.     Demands for collection fees in addition to the principal amounts allegedly owed by former customers of the Debtors;

   d.     Principal amounts which the Attorneys General assert to constitute "double charges" whereby a consumer is held responsible for both late fees and

product charges[2] for items purportedly rented;

e.     Issues relating to the validity and/or enforceability of some or all of the
       Customer Accounts alleged to be due and owing, including, for example,
       issues relating to waiver, estoppel, and alleged lack of supporting
       documentation or other evidence to substantiate the alleged debts;

f.     Consumer complaints directly challenging underlying amounts alleged to be
       due and owing; and

g.     Issues relating to the collection tactics used by CCS and/or NCS with
       respect to their efforts to collect the Customer Accounts.

6.     The Trustee contends that all actions taken by the Trust to date in connection with
efforts to collect the Customer Accounts have been appropriate, and consistent with the Plan, the
Debtors' customer agreements and applicable law.

7.     NCS has advised the Trust that: (i) it furnished negative credit reporting
information regarding the Customer Accounts to TransUnion and Experian but not to any other
credit reporting agencies; (ii) by no later than January 29, 2011, NCS had requested that
TransUnion and Experian reverse any negative credit reporting previously initiated by NCS with
respect to any of the Customer Accounts, and (iii) NCS has already furnished to TransUnion and
Experian all necessary information regarding the Customer Accounts to enable TransUnion and
Experian to reverse all such negative credit reports.

8.     NCS has also advised the Trust that, to the extent any collection fees were paid by
customers as part of NCS's efforts to collect the Customer Accounts, the full amounts of such
collection fees were paid to and retained by NCS, and no portion of such collection fees were paid

---

[2] A "Product Charge" is defined as a charge imposed by Hollywood Video or Movie Gallery for the value or cost of
a rental item.

to or retained by the Trust.

9.      The Trustee, with the approval and consent of the Trust's Oversight Committee, wishes to resolve the objections and concerns raised by the Attorneys General, in order that the Trust may proceed with efforts to collect valid Customer Accounts in a commercially reasonable and lawful manner. Subject only to the Court's approval of this Stipulation and Agreed Order, the Attorneys General have agreed that the Trustee may pursue the continued collection of valid Customer Accounts on the terms set forth below.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED:

A.      **Rescission of All Previously Submitted Credit Reports.** The Trustee agrees to take such further steps, if any, as may be reasonably necessary and within the Trustee's power to assure that all negative credit reports submitted to any credit agency or bureau relating to the Customer Accounts are rescinded.

B.      **No Future Credit Reporting and Future Collection Practices.** The Trustee agrees that no further reports will be submitted by the Trust, or by any collection agency or other agent acting on behalf of the Trust, to any credit reporting agency or bureau relating to the Customer Accounts at any time. The Trustee further agrees to take such steps as are reasonably necessary with CCS, NCS, and/or any other third party collection firm retained by the Trust to collect the Customer Accounts to assure that this provision is effectively implemented and adhered to. The Trustee shall also take all reasonably necessary actions to assure that any agent acting to pursue collection of any of the Customer Accounts expressly agrees that it shall comply with the provisions of the Fair Debt Collection Practices Act, applicable state laws, and with the venue provisions of 28 U.S.C. 1409(b) for any related litigation. Any collection agency utilized by the Trust to collect Customer Accounts shall also expressly agree that its employees and/or agents will

not state, suggest, imply or otherwise represent to any customer that their failure or refusal to pay the Customer Account could result in adverse credit reporting by the Trust or by the collection agency.

      C.    **No Future Collection of Fees or Interest**. The Trustee agrees that, in connection with any further efforts to collect the Customer Accounts, there shall be no collection fees or interest charges imposed on or added to the principal amounts owed by consumers on any of the Customer Accounts. The Trustee further agrees to take such steps as are reasonably necessary with CCS, NCS and/or any other third party collection firm retained by the Trust to collect the Customer Accounts to assure that this provision is effectively implemented and adhered to.

      D.    **Collection Fees Paid Prior to the Effective Date of this Stipulation**. The Trustee agrees to reasonably assist the Attorneys General in any effort to recover any collection fees that were improperly recovered by CCS or NCS prior to the effective date of this Stipulation, provided however, that such assistance shall not require the Trustee or the Trust to commence, prosecute or pursue any judicial or administrative action or similar proceeding.  Reasonable assistance shall include, but not be limited to, obtaining information requested by the Attorneys General from Hollywood Video and Movie Gallery that relates to the Customer Accounts, or obtaining other information within the possession, custody or control of the Trustee which the Attorneys General deem reasonably necessary to pursue NCS or CCS with regard to their collection activities concerning the Customer Accounts

      E.    **Disputed Late Fees or Product Charges**. With respect to any individual consumer who has complained or does complain to the offices or agencies of any state, the Better Business Bureau, the Trustee or the Trustee's agents, specifically contending that no late fees or

Product Charges were due, and so long as such complaint has first been provided to the Trustee, the Trust agrees that it will undertake no further collection efforts with respect to that Customer Account without first completing a review of the Debtor's business records and concluding, based on such investigation, that there is a reasonable basis to conclude that such late fees and/or Product Charges are in fact due and owing in accordance with the contractual terms applicable to the customer. Upon the request of the Attorney General or other appropriate office or agency with jurisdiction over any such customer's complaint, the Trust will share the results of its aforementioned investigation with such office or agency, subject to such confidentiality restrictions as may be required by law, prior to authorizing CCS, NCS and/or any other third party collection firm retained by the Trust to resume collecting the Customer Account.

F.    **No Recovery of Both Late Fee and Product Charges.** The Trustee agrees that for those Customer Accounts which include both a late fee and a Product Charge (for the same item), collection will be pursued only for the lesser of the two charges for any given rental item.

G.    **No Recovery of Stand-Alone Product Charges.** The Trustee agrees not to pursue the collection of any Product Charges related to a specific transaction if the Product Charge is the only fee reflected on the Customer Account for that transaction.

H.    **In the Event of the Sale of Customer Accounts.** To the extent that the Trustee transfers title to and ownership of any Customer Account to any third party, it agrees to do so pursuant to the following limitations:

i.    Any such proposed sale or transfer shall include, as an attachment to the contract, a copy of this Stipulation and a term within the contract stating that the purchaser agrees that it is subject to the terms of this Stipulation as if it were the Trustee, including, but not limited to, any limitations regarding the use of third-party collection agencies and refraining from referring any Customer Account to any credit reporting agency or credit bureau.

ii.     In addition to any notice or procedures required by the Court, the
Trustee agrees to provide written notice to the Attorneys General of
such pending sale at least 30 days prior to the completion of such
sale. The notice should include:

a.     the name and business contact information of the company
to whom the debt is to be sold;

b.     the contact information for the person with whom the sale is
being negotiated; and

c.     a copy of the proposed sale contract containing all terms of
the agreement.

I.     In consideration of the Trustee's agreement to, and subject to the Trustee's

ongoing compliance with, the provisions of this Stipulation, the Attorneys General agree (i) not to

interpose any generalized objections to the validity or legitimacy of the Customer Accounts, (ii) to

take no actions to prevent, interfere with or delay the Trustee's collection of the Customer

Accounts provided that such collection efforts are consistent with applicable state and federal law

and with the terms set forth herein (subject to the rights of the Attorneys General to act on behalf

of individual customer complaints as expressly provided for in the following sentence), and (iii) to

assert no claims, actions or damages, and to seek no relief, whether legal or equitable, against the

Trustees, the Trust, the beneficiaries of the Trust, the affiliates of any of the foregoing (which, for

the avoidance of doubt, shall not include either CCS or NCS) or any of their respective

professionals arising from the objections and concerns stated in above paragraph 5 of this

Stipulation. Notwithstanding the foregoing, or any of the language included in Paragraph E, the

Attorneys General reserve the right to take any and all appropriate actions reasonably necessary to

assist any individual resident of their respective states in efforts to resolve concerns or disputes

regarding a particular Customer Account, and the Trustee reserves all claims, rights and defenses

of the Trust and of the Debtors with respect to any such Customer Account.

J.     In consideration of the Attorneys' General agreement to the provisions of

this Stipulation, the Trustee, acting for and on behalf of the Trust and its beneficiaries, their agents, assigns, affiliates, successors and respective professionals, agrees to assert no claims, actions or damages, and to seek no relief, whether legal or equitable, against any of the Attorneys General for acts related to or arising out of the Attorneys' General investigation and/or the resolution of that investigation of the objections and concerns stated in above paragraph 5 of this Stipulation.

K.    The Court shall retain exclusive jurisdiction over any disputes or claims arising from or related in any way to the Stipulation. Any motion or application brought before the Court to resolve a dispute arising from or related to this Stipulation and Agreed Order shall be brought on proper notice upon the undersigned parties in accordance with the relevant Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia. Notwithstanding the foregoing, this Stipulation shall not vest jurisdiction in the Court over claims by a private party or public official, based on state or federal law, against any third party collection firm that is involved in attempting to collect the Customer Accounts.

L.    Nothing in this Stipulation shall be construed to create, waive, or limit any right of action by any of the Parties against any third party collection agency. This Stipulation does not constitute a release or waiver of claims against any third party, including but not limited to CCS and/or NCS.

M.    Nothing in this Stipulation shall be construed to create, waive, or limit any private right of action or any other action by any party other than the Attorneys General.

N.    The Trustee's agreement to comply with the provisions of this Stipulation shall be limited to Customer Accounts of customers resident within the jurisdictions of the respective Attorneys General, and the Trustee's pursuit of the collection of Customer Accounts of

customers resident outside of the jurisdictions of the respective Attorneys General shall be unaffected by this Stipulation.

O.     Nothing in this Stipulation shall be construed as relieving the Trustee of the obligation to comply with all state and federal laws, regulations or rules, nor shall any of the provisions of this Stipulation be deemed to be permission to engage in any acts or practices prohibited by such law, regulation, or rule.

P.     Once approved by the Court, this Stipulation shall be binding on and inure to the benefit of the Parties hereto and their respective successors and assigns.

Q.     The Parties' resolution, as set forth in this Stipulation, is acknowledged to be consensual.

R.     The undersigned Parties hereby represent and warrant that: (i) they have full authority to execute this Stipulation and Agreed Order; (ii) they have full knowledge of, and have consented to, this Stipulation and Agreed Order; and (iii) they are fully authorized to bind themselves to all of the terms and conditions of this Stipulation and Agreed Order.

S.     Each Party shall bear its own attorneys' fees and costs in connection with the matters resolved hereby.

T.     This Stipulation shall not be modified, altered, amended or vacated without the written agreement of the Parties.

U.     Beginning on the effective date of this Stipulation and Agreed Order, information regarding consumer complaints submitted to the Attorneys General and that relate to or arise out of the objections and concerns stated in above paragraph 5 of this Stipulation, including without reservation acts undertaken by any successor to the Trustee or unnamed collection agents, will be directed to the following designee at the addresses provided:

Hollywood Video/Movie Gallery Customer Service
c/o Mr. Ryan Storfa
7405 Southwest Tech Center Drive, Suite 130
Tigard, Oregon 97223
Email: customerrequests@hlyw.com

     V.    This Stipulation and Agreed Order may be signed in counterparts, and when

taken together, shall constitute a single document.

     W.    This Stipulation and Agreed Order shall be effective immediately

upon its entry by the Court, and no stay shall apply.

**STATE OF ALABAMA**
Luther Strange, Attorney General

By: ___/s/ Noel S. Barnes_____
    Noel S. Barnes (BAR155)
    Assistant Attorney General
    State of Alabama
    Office of the Attorney General
    501 Washington Avenue
    Post Office Box 300152
    Montgomery, Alabama 36130
    Telephone: (334) 353-9196
Email: nbarnes@ago.state.al.us

**STATE OF ALASKA**
John J. Burns, Attorney General

By: _/s/ Davyn D. Williams_____
    Davyn D. Williams
    Alaska Bar No. 0711093
    Assistant Attorney General
    Alaska Office of the Attorney General
    1031 W. 4th Ave., Suite 200
    Anchorage, AK 99501
    Telephone: (907) 269-5200
    Email: Davyn.williams@alaska.gov
**STATE OF ARIZONA**
Thomas C. Horne, Attorney General

By: _/s/ Rebecca C. Salisbury_____
    Rebecca C. Salisbury
    Assistant Attorney General

Office of the Arizona Attorney General
1275 W. Washington Street
Phoenix, Arizona 85007
Telephone: (602) 542-7757
Email: Rebecca.Salisbury@azag.gov

**STATE OF ARKANSAS**
Dustin McDaniel, Attorney General

By: ___/s/ Sarah R. Tracker_____
    Sarah R. Tacker,
      Arkansas Bar No. 2002189
    Senior Assistant Attorney General
    Office of the Arkansas Attorney General
    323 Center Street, Suite 500
    Little Rock, AR 72201.
    Telephone: (501) 682-1321
    Email: sarah.tacker@arkansasag.gov
**STATE OF CALIFORNIA**
Kamala D. Harris, Attorney General

By: ___/s/ Kamala D. Harris_____
    Kamala D. Harris
    California Bar No. 146672
    Attorney General
    Office of the California Attorney
    General
    1300 I Street, Sacramento, CA 95814
    Telephone: (916) 324-5437
    Email: attorneygeneral@doj.ca.gov

**STATE OF COLORADO**
John Suthers, Attorney General

By: /s/ Jay B. Simonson
    Jay B. Simonson
    Colorado Bar No. 24077
    First Assistant Attorney General
    Office of the Colorado Attorney
    General
    1525 Sherman St., Denver CO 80203
    Telephone: (303) 866-5162
    Email: jay.simonson@state.co.us

**STATE OF CONNECTICUT**
George Jepsen, Attorney General

By: /s/ Brendan T. Flynn
    Brendan T. Flynn (ct04545)
    Assistant Attorney General
    Office of the Attorney General
    110 Sherman Street
    Hartford, Connecticut 06105
    Phone: 860-808-5400
    Email: Brendan.Flynn@ct.gov

**STATE OF DELAWARE**
Joseph R. Biden, III, Attorney General

By: /s/ Jeremy D. Eicher
    Jeremy D. Eicher
    Delaware Bar No. 5093
    Deputy Attorney General
    Delaware Department of Justice
    820 N. French Street
    Wilmington, Delaware 19801

**DISTRICT OF COLUMBIA**
Irvin B. Nathan, Acting Attorney General

By: /s/ Bennett Rushkoff
    Bennett Rushkoff
    Chief, Public Advocacy Section

By: /s/ Grant G. Moy, Jr.
    Grant G. Moy, Jr.
    Assistant Attorney General
    441 4th Street, NW, Suite 650N
    Washington, DC 20001
    Telephone: (202) 727-6337
    Email: grant.moy@dc.gov

    Attorneys for the District of Columbia

**STATE OF FLORIDA**
Pamela Jo Bondi, Attorney General

By: /s/ Andrew Bennett Spark
    Andrew Bennett Spark
    Florida Bar No. 0899811
    Assistant Attorney General
    Florida Attorney General's Office
    3507 E. Frontage Rd., Ste. 325
    Tampa, FL 33607
    Telephone: (813) 287-7950
    Email:Andrew.Spark@myfloridalegal.com

**STATE OF GEORGIA**
John D. Sours, Administrator,
Fair Business Practices Act

By: /s/ John D. Sours
    John D. Sours
    Administrator, Governor's Office
    of Consumer Protection
    Georgia Bar No. 667350.
    2 Martin Luther King, Jr. Drive
    East Tower, Suite 356

Atlanta, Georgia 30334
Telephone: (404) 656-3790

**STATE OF HAWAII**
Stephen H. Levins, Executive
Director of the Office of Consumer
Protection

By:   /s/ Jeffrey E. Brunton
Jeffrey E. Brunton, Staff Attorney
Department of Commerce and
Community Affairs
Office of Consumer Protection
235 South Beretania Street, Suite 801
Honolulu, Hawaii 96813
Telephone: (808) 536-2636
Email: ocp@dcca.hawaii.gov

**STATE OF IDAHO**
Lawrence Wasden, Attorney General

By:   /s/ Stephanie Guyon
Stephanie Guyon
Deputy Attorney General
Consumer Protection Division
Office of the Idaho Attorney General
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, Idaho 83720-0010
Telephone: (208) 334-4135
Email: stephanie.guyon@ag.idaho.gov

**STATE OF ILLINOIS**
Lisa Madigan, Attorney General

By:   /s/ Jeffrey M. Feltman
Jeffrey M. Feltman
Illinois Bar No. 106237048
Assistant Attorney General
Office of the Illinois Attorney General
1001 E. Main St.
Carbondale, IL 62975
Telephone: (618) 529-6418

Email: jfeltman@atg.state.il.us

**STATE OF INDIANA**
Gregory F. Zoeller, Attorney General

By:   /s/ Mark M. Snodgrass
Mark M. Snodgrass
Deputy Attorney General
Atty. No. 29495-49
Office of Attorney General
302 W. Washington Street, 5th Floor
Indianapolis, IN 46204
Telephone: (317) 234-6784
Email: Mark.Snodgrass@atg.in.gov

**STATE OF IOWA**
Thomas J. Miller, Attorney General

By:   /s/ Jessica J. Whitney
Jessica J. Whitney
Assistant Attorney General
Hoover Building, 2nd Floor
1305 East Walnut
Des Moines, IA 50319
Telephone: (515) 281-6386
Email: Jessica.Whitney@iowa.gov

**STATE OF KANSAS**
Derek Schmidt, Attorney General

By:   /s/ Derek Schmidt
Derek Schmidt
Kansas Bar No. 17781
Office of Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Telephone: (785) 296-2215
Email: Derek.Schmidt@ksag.org

Email: Linda.conti@maine.gov

**COMMONWEALTH OF KENTUCKY**
Jack Conway, Attorney General

By:  /s/ Kevin R. Winstead
    Kevin R. Winstead
    Kentucky Bar No. 82250
    Assistant Attorney General
    Kentucky Attorney General's Office
    of Consumer Protection
    1024 Capital Center Drive, Suite 200
    Frankfort, KY 40601-8204
    Telephone: (502) 696-5389
    Email: kevin.winstead@ag.ky.gov

**STATE OF LOUISIANA**
James D. "Buddy" Caldwell, Attorney
General

By:  /s/ James D. "Buddy" Caldwell
    James D. "Buddy" Caldwell
    Post Office Box 94005
    Baton Rouge, LA 70804

**STATE OF MARYLAND**
Douglas F. Gansler, Attorney General

By:  /s/ Catherine Dowling
    Catherine Dowling
    Assistant Attorney General
    Office of the Attorney General
    Consumer Protection Division
    200 Saint Paul Place
    Baltimore, Maryland 21202
    Telephone: (410) 576-6577

**STATE OF MASSACHUSETTS**
Martha Coakley, Attorney General

By:  /s/ David W. Monahan
    David W. Monahan
    BBO # 551768
    Deputy Chief
    Consumer Protection Division
    Office of the Attorney General
    One Ashburton Place
    Boston, MA 02108
    Telephone (617) 727-2200, x. 2954
    Email: David.Monahan@state.ma.us

**STATE OF MAINE**
William J. Schneider, Attorney General

By:  /s/ Linda Conti
    Linda Conti
    Assistant Attorney General
    ME Bar. No. 3638
    Office of the Attorney General
    State House Station 6
    Augusta, ME 04333
    Telephone: (207) 626-8591

**STATE OF MICHIGAN**
Bill Schuette, Attorney General

By:  /s/ Kathy Fitzgerald
    Kathy Fitzgerald (P31454)
    Assistant Attorney General
    Consumer Protection Division
    P.O. Box 30213
    Lansing, MI 48909

**STATE OF MINNESOTA**
Lori Swanson, Attorney General

By:     /s/ David Cullen
     David Cullen
     Assistant Attorney General
     Minnesota Atty. Reg. No. 0338898
     445 Minnesota St., #1200
     St. Paul, MN 55101-2130
     Telephone: (651) 757-1221
     Email: david.cullen@state.mn.us

**STATE OF MISSISSIPPI**
Jim Hood, Attorney General

By:     /s/ Meredith M. Aldridge
     Meredith M. Aldridge
     Mississippi Bar No. 100696
     Special Assistant Attorney General
     Office of the Mississippi Attorney
     General
     550 High Street, Suite 1200
     Jackson, MS 39201
     Telephone: (601) 359-4204
     Email: maldr@ago.state.ms.us

**STATE OF MISSOURI**
Chris Koster, Attorney General

By:     /s/ Douglas M. Ommen
     Douglas M. Ommen
     Chief Counsel
     Consumer Protection Division
     PO Box 899
     Jefferson City, MO 65102
     Telephon: (573) 751-7007
     Email: Doug.Ommen@ago.mo.gov

**STATE OF MONTANA**
Steve Bullock, Attorney General

By:     /s/ Jim Molloy
     Jim Molloy
     Chief of Consumer Protection
     Chuck Munson
     Assistant Attorney General
     Office of Consumer Protection
     215 N. Sanders
     Helena, MT 59601
     Telephone: (406) 444-2026
     Email: jmolloy@mt.gov

**STATE OF NEBRASKA**
Jon Bruning, Attorney General

By:     /s/ Leslie C. Levy
     Leslie C. Levy
     Nebraska Bar No. 20673
     Assistant Attorney General
     Office of the Nebraska Attorney
     General
     2115 State Capitol Building
     Lincoln NE 68509
     Telephone: (402) 471-2811
     Email: leslie.levy@nebraska.gov

**STATE OF NEVADA**
Catherine Cortez Masto, Attorney General

By:     /s/ Jo Ann Gibbs
     Jo Ann Gibbs
     Senior Deputy Attorney General
     Nevada Bar No. 005324
     555 E. Washington Avenue, #3900
     Las Vegas, Nevada 89101
     Telephone: 702-486-3789
     Email: jgibbs@ag.nv.gov

Email: lotero@nmag.gov

**STATE OF NEW HAMPSHIRE**
Michael A. Delaney, Attorney General

By:    /s/ Constance N. Stratton
    Constance N. Stratton
    New Hampshire Bar No. 7939
    Senior Assistant Attorney General
    Office of the New Hampshire
    Attorney General
    33 Capitol St.
    Concord, NH 03301
    Telephone: (603) 271-3643
    Email: connie.stratton@doj.nh.gov

**STATE OF NEW JERSEY**
Paula T. Dow, Attorney General

By:   /s/ Patricia Schiripo
    Patricia Schiripo
    Deputy Attorney General
    Assistant Section Chief
    Consumer Fraud Prosecution, PS 8312
    PS 8312, Division of Law
    124 Halsey Street 5th Floor
    Newark, New Jersey 07101
    Email:
patricia.schiripo@dol.lps.state.nj.us

**STATE OF NEW MEXICO**
Gary K. King, Attorney Generl

By:    /s/ Lawrence Otero
    Lawrence Otero
    Assistant Attorney General
    Office of the Attorney General
    Consumer Protection Division
    P.O. Drawer 1508
    Santa Fe, NM 87501
    Telephone: 505-827-6704

**STATE OF NEW YORK**
Eric T. Schneiderman, Attorney General

By:    /s/ Amy Schallop
    Amy Schallop
    Assistant Attorney General
    The Capitol
    Albany, New York 12224-0341
    Telephone: (518) 486-4555

**STATE OF NORTH CAROLINA**
Roy Cooper, Attorney General

By:    /s/ M. Lynne Weaver
    M. Lynne Weaver
    Assistant Attorney General
    N.C. Bar No. 19397
    P.O. Box 629
    114 W. Edenton St.
    Raleigh, NC 27602
    Telephone: 919.716.6000
    Email: lweaver@ncdoj.gov

**STATE OF NORTH DAKOTA**
Wayne Stenehjem, Attorney General

By:   /s/ Parrell Grossman
    Parrell Grossman, I.D. Number 04684
    Assistant Attorney General, Director
    Consumer Protection
    and Antitrust Division
    Office of Attorney General
    Gateway Professional Center
    1050 E. Interstate Ave. Ste 200
    Bismarck, ND 58503-5574
    Telephone: (701) 328-5570

**STATE OF OHIO**
Michael Dewine, Attorney General

By:   /s/ Melissa G. Wright
    Melissa G. Wright (Ohio Bar No.
    0077843)
    Assistant Attorney General Consumer
    Protection
    Section 30
    East Broad Street, 14th Floor
    Columbus, Ohio 43215-3428
    Telephone: (614) 466-8169
    Email:
melissa.wright@ohioattorneygeneral.gov

**STATE OF OKLAHOMA**
E. Scott Pruitt, Attorney General

By:   /s/ Julie A. Bays
    Julie A. Bays
    Assistant Attorney General
    Consumer Protection Unit
    313 N.E. 21st Street
    Oklahoma City, Oklahoma 73105
    Telephone: (405) 522-3082
    Email: Julie.Bays@oag.ok.gov

**STATE OF OREGON**
John R. Kroger, Attorney General

By:   /s/ Andrew U. Shull
    Andrew U. Shull  OR Bar# 024541
    Assistant Attorney General
    Civil Enforcement Division
    Oregon Department of Justice
    1162 Court Street, NE
    Salem, OR 97301-4096
    Telephone: (503) 934-4400
    Email: andrew.shull@doj.state.or.us

**STATE OF PENNSYLVANIA**
William H. Ryan, Jr., Attorney General

By:   /s/ John M. Abel
    John M. Abel
    Senior Deputy Attorney General
    Pennsylvania Office of Attorney
    General
    Bureau of Consumer Protection
    PA Attorney I.D. No. 47313
    Office of Attorney General
    15th Floor, Strawberry Square
    Harrisburg, Pennsylvania 17120
    Telephone: (717) 787-9707
    Email: jabel@attorneygeneral.gov

**STATE OF RHODE ISLAND**
Peter F. Kilmartin, Attorney General

By:   /s/ Edmund F. Murray, Jr.
    Edmund F. Murray, Jr. Esq. (#3096)
    Special Assistant Attorney General
    Rhode Island Department
    of Attorney General
    150 South Main Street
    Providence, RI 02903-2907
    Telephone (401) 274-4400 x 2401
    Email: emurray@riag.state.ri.us

**STATE OF SOUTH CAROLINA**
Alan Wilson, Attorney General

By:   /s/ C. Havird Jones, Jr.
C. Havird Jones, Jr.
South Carolina Bar No. 3178
Assistant Deputy Attorney General
Office of the South Carolina
Attorney General
Rembert Dennis Building
1000 Assembly Street, Room 519
Columbia, SC 29201
Email: agsjones@scag.gov

**STATE OF SOUTH DAKOTA**
Marty J. Jackley, Attorney General

By:   /s/ Jeffery J. Tronvold
Jeffery J. Tronvold
Assistant Attorney General
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
Telephone: (605) 773-3215
Email: Jeffery.tronvold@state.sd.us

**STATE OF TENNESSEE**
Robert E. Cooper, Jr., Attorney General

By:   /s/ Gina Baker Hantel
Gina Baker Hantel, Senior Counsel
Tennessee Bar No. 018019
Office of the Tennessee Attorney
General
Bankruptcy Division
Post Office Box 20207
Nashville, Tennessee 37202-0207
Telephone: (615) 532-8928
Email: Gina.Hantel@ag.tn.gov

**STATE OF TEXAS**
Greg Abbott, Attorney General

By:   /s/ Bruce V. Griffiths
Bruce V. Griffiths
Texas State Bar No. 08486500
1Assistant Attorney General

Consumer Protection &
Public Health Division
P.O. Box 12548
Austin, Texas 78711-2548
Telephone (512) 475-4184
Email: Bruce.Griffiths@oag.state.tx.us

**STATE OF UTAH**
Mark L. Shurtleff, Attorney General

By:   /s/ Annina M. Mitchell
Annina M. Mitchell
Utah Bar No. 2274
Utah Solicitor General
Office of the Utah Attorney General
160 East 300 South
PO Box 140848
Salt Lake City, UT 84114-0858
Telephone: (808) 366-0533

**STATE OF VERMONT**
William H. Sorrell, Attorney General

By:   /s/ Elliot Burg
Elliot Burg
Assistant Attorney General
Office of the Vermont Attorney
General
109 State Street
Montpelier, VT 05609
Telephone (802) 828-2153
Email: eburg@atg.state.vt.us

**COMMONWEALTH OF VIRGINIA**
Kenneth T. Cuccinelli, II, Attorney General

By:   /s/ Mark M. Kubiak
      Mark S. Kubiak, VSB # 73119
      Assistant Attorney General
      Office of the Attorney General
      900 East Main Street
      Richmond, Virginia 23219
      Telephone: (804) 786-7364
      Email: mkubiak@oag.state.va.us

**STATE OF WASHINGTON**
Robert M. McKenna, Attorney General

By:   /s/ Mary C. Lobdell
      MARY C. LOBDELL
      Assistant Attorney General
      Office of the Washington
      Attorney General
      Consumer Protection Division
      P.O. Box 2317
      Tacoma, WA 98401-2317

**STATE OF WEST VIRGINIA**
1Darrell McGraw, Jr., Attorney General

By:   /s/ Matthew Stonestreet
      1Matthew Stonestreet
      (WV State Bar #11398)
      Assistant Attorney General
      Office of the West Virginia Attorney
General
      812 Quarrier St.
      Charleston, WV 25301
      Telephone: (304) 558-8986
      Emil: matthew.stonestreet@wvago.gov

**STATE OF WISCONSIN**
J.B. Van Hollen, Attorney General

By:   /s/ Lara Sutherlin
      Lara Sutherlin
      Assistant Attorney General
      State Bar #1057096
      Wisconsin Department of Justice
      Post Office Box 7857
      Madison, Wisconsin 53707-7857
      Telephone: (608) 267-7163
      Email: sutherlinla@doj.state.wi.us

**STATE OF WYOMING**
Gregory A. Phillips, Attorney General

By:   /s/ Gregory A. Phillips
      Gregory A. Phillips
      Wyoming Bar No. 5-2516
      Office of the Wyoming Attorney
      General
      123 Capitol Building
      Cheyenne, WY 82002
      Telephone: (307) 777- 7841
      Email: gphill@state.wy.us

**CORLISS MOORE & ASSOCIATES,**
**LLC,** solely in its capacity as Liquidating
Trustee for the First Lien Term Lenders
Liquidating Trust

By:   /s/ Steve Moore
      Steve Moore, Trustee

## LOCAL RULE 9022-1(C)(1) CERTIFICATION

Pursuant to the Local Rules, I certify under penalty of perjury that all necessary parties have endorsed this Stipulation and Agreed Order.

By: /s/ Michael A. Condyles

**THIS STIPULATION IS SO ORDERED**

Dated: May 5 2011
     Richmond, Virginia

/s/ Douglas O. Tice Jr.
    Chief Judge Douglas O. Tice, Jr.
    United States Bankruptcy Judge

Entered on Docket: May 6 2011

# EXHIBIT D

**From:** Jason Sansone <jason@nationalcreditsolutions.net> 
**Subject:** Fwd: Corliss Moore & Associates v. National Credit Solutions, LLC
**Date:** April 17, 2012 4:26:09 PM CDT
**To:** David J Heggarty <DHAGGART@travelers.com>, Brett Evans <president@nationalcreditsolutions.net>, Jamie Watson
<generalmanager@nationalcreditsolutions.net>, cmontoya@hinshawlaw.com, jweller@hinshawlaw.com

3 Attachments, 2.6 MB

A complaint has been filed by the HWVMG trustees against NCS and CCS. See attached. A claim for coverage in this matter is requested and a reconsideration of the prior request for coverage regarding CCS's Rule 2004 motion is requested. The matters are linked and any documentation produced to either CCS or the trustees will be discovered by the other party.

Jason A. Sansone
Corporate Compliance Officer
National Credit Solutions
Cell: (405) 550-4564
Fax: (405) 619-3631
Jason@NationalCreditSolutions.net

Begin forwarded message:

**From:** "Williams, Jeremy S " <Jeremy.Williams@KutakRock.com>
**Subject: Corliss Moore & Associates v. National Credit Solutions, LLC**
**Date:** April 17, 2012 4:05:44 PM CDT
**To:** "jason@nationalcreditsolutions.net" <jason@nationalcreditsolutions.net>
**Cc:** "Adler, Lani A " <lani.adler@klgates.com>, "Bicks, John A " <John.Bicks@klgates.com>, "Condyles, Michael A." <Michael.Condyles@KutakRock.com>

Jason:
Please find attached a copy of the Complaint and related exhibits we just filed in the Eastern District of Virginia. Once the summons is issued  we will send you the complaint and summons in hard copy. Feel free to contact us with any questions

Jeremy S. Williams
Kutak Rock LLP
Bank of America Center
1111 East Main Street  8th Floor
Richmond, Virginia 23219
(804) 343-5257 (phone)
(804) 783-6192 (fax)

ANY FEDERAL TAX ADVICE CONTAINED IN THIS MESSAGE SHOULD NOT BE USED OR REFERRED TO IN THE PROMOTING, MARKETING OR RECOMMENDING OF ANY ENTITY, INVESTMENT PLAN OR ARRANGEMENT, AND SUCH ADVICE IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY A TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE

This E-mail message is confidential, is intended only for the named recipients above and may contain information that is privileged, attorney work product or otherwise protected by applicable law. If you have received this message in error, please notify the sender at 402-346-6000 and delete this E-mail message.
Thank you.

Complaint (...).pdf (90 KB)

Complaint ...pdf (2.4 MB)

Complaint C...pdf (127 KB)

# EXHIBIT E

From: Jason Sansone <jason@nationalcreditsolutions.net>
Subject: Re: Corliss Moore & Associates v. National Credit Solutions, LLC
Date: April 18, 2012 8:24:02 AM CDT
To: "Haggarty,David J" <DHAGGART@travelers.com>
Cc: Brett Evans <president@nationalcreditsolutions.net>, Jamie Watson <generalmanager@nationalcreditsolutions.net>, "cmontoya@hinshawlaw.com" <cmontoya@hinshawlaw.com>, "jweller@hinshawlaw.com" <jweller@hinshawlaw.com>



Thank you

Jason A. Sansone
Corporate Compliance Officer
National Credit Solutions
Cell: (405) 550-4564
Jason@NationalCreditSolutions.net
Sent from my iPhone

On Apr 18, 2012, at 7:58 AM, "Haggarty,David J" <DHAGGART@travelers.com> wrote:

> Dear Jason:
>
> I have forwarded your email internally to create a claim file for the attached Complaint.  We will review the claim and determine our coverage position.
>
> Thank you.
>
> Sincerely,
>
>
> David J. Haggarty
> Sr. Claim Executive
> 888-882-4853
> 866-608-9632 - Fax
>
> <image001.gif>

From: Jason Sansone [mailto:jason@nationalcreditsolutions.net]
Sent: Tuesday, April 17, 2012 4:26 PM
To: Haggarty,David J; Brett Evans; Jamie Watson; cmontoya@hinshawlaw.com; jweller@hinshawlaw.com
Subject: Fwd: Corliss Moore & Associates v. National Credit Solutions, LLC

A complaint has been filed by the HWV/MG trustees against NCS and CCS.  See attached.  A claim for coverage in this matter is requested and a reconsideration of the prior request for coverage regarding CCS's Rule 2004 motion is requested.  The matters are linked and any documentation produced to either CCS or the trustees will be discovered by the other party.


Jason A. Sansone
Corporate Compliance Officer
National Credit Solutions
Cell: (405) 550-4564
Fax: (405) 619-3631
Jason@NationalCreditSolutions.net

Begin forwarded message:


From: "Williams, Jeremy S." <Jeremy.Williams@KutakRock.com>
Subject: Corliss Moore & Associates v. National Credit Solutions, LLC
Date: April 17, 2012 4:05:44 PM CDT
To: "jason@nationalcreditsolutions.net" <jason@nationalcreditsolutions.net>
Cc: "Adler, Lani A." <lani.adler@klgates.com>, "Bicks, John A." <John.Bicks@klgates.com>, "Condyles, Michael A." <Michael.Condyles@KutakRock.com>


Jason,
   Please find attached a copy of the Complaint and related exhibits we just filed in the Eastern District of Virginia.  Once the summons is issued, we will send

you the complaint and summons in hard copy  Feel free to contact us with any questions

Jeremy S  Williams
Kutak Rock LLP
Bank of America Center
1111 East Main Street, 8th Floor
Richmond, Virginia 23219
(804) 343-5257 (phone)
(804) 783-6192 (fax)

ANY FEDERAL TAX ADVICE CONTAINED IN THIS MESSAGE SHOULD NOT BE USED OR REFERRED TO IN THE PROMOTING, MARKETING OR RECOMMENDING OF ANY ENTITY, INVESTMENT PLAN OR ARRANGEMENT, AND SUCH ADVICE IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY A TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE.

This E-mail message is confidential, is intended only for the named recipients above and may contain information that is privileged, attorney work product or otherwise protected by applicable law. If you have received this message in error, please notify the sender at 402-346-6000 and delete this E-mail message.
Thank you.

This communication, including attachments, is confidential, may be subject to legal privileges, and is intended for the sole use of the addressee. Any use, duplication, disclosure or dissemination of this communication, other than by the addressee, is prohibited  If you have received this communication in error, please notify the sender immediately and delete or destroy this communication and all copies.

# EXHIBIT F

From: AGHAYES@travelers.com
Subject: Corliss Moore & Associates LLC / T1206737 / National Credit Solutions LLC
Date: April 18, 2012 12:11:04 PM CDT
To: jason@nationalcreditsolutions.net, DHAGGART@travelers.com

1 Attachment, 28 KB

Name : Angie Hayes
Phone : (651) 310-2601
Fax : (866) 608-9632

This communication, including attachments, is confidential, may be subject to legal privileges, and is intended for the sole use of the addressee. Any use, duplication, disclosure or dissemination of this communication, other than by the addressee, is prohibited. If you have received this communication in error, please notify the sender immediately and delete or destroy this communication and all copies.

**TRAVELERS**

385 Washington Street
Mail Code 9276-NB03F
St. Paul, MN 55102

April 18, 2012

Jason Sansone
National Credit Solutions, LLC
3680 E I-240 Service Road
OKLAHOMA CITY, OK 73135

RE     Insured Name    National Credit Solutions, LLC
          Policy Number   105446858
          Reference:    Corliss Moore & Associates, LLC
          Reference Number  037-MPL-T1206737-NR

Dear Sir/Madam

This letter formally acknowledges Travelers Casualty and Surety Company of America's receipt of the above matter.

Travelers understands that life is full of uncertainty. Rest assured that our claim professionals are ready to help. When working with Travelers you can always expect to be assisted promptly and treated with the utmost respect, integrity, professionalism and skill. Please refer to the attached Claim Service Guide for information on the Travelers Claim Experience.

This matter has been assigned to the below-referenced claim professional who will contact you shortly. Please refer to the matter number 037-MPL-T1206737-NR on all future communications with us.

Dave Haggart
Senior Claim Executive
Bond & Financial Products Claim
Phone: (651) 310-8156
Fax: (651) 310-8231
Email: DHAGGART@travelers.com

The claim professional will be communicating with you regarding coverage for this matter. Please note that our attention to this matter shall not be deemed a waiver of any rights or defenses that may be available to Travelers Casualty and Surety Company of America and all such rights and defenses are hereby expressly reserved.

Travelers Bond & Financial Products
Travelers Casualty and Surety Company of America

If possible, please send future communications and documents concerning this claim via email (DHAGGART) or via client note. Please include the claim number in the subject line. (Please note that in certain cases we may still respond via mail if necessary.)

Rev 01 03 10

# EXHIBIT G

From: Jason Sansone <jason@nationalcreditsolutions.net> 
Subject: Re: Corliss Moore & Associates v. National Credit Solutions, LLC, et al. Claim #: T1206737
Date: April 27, 2012 5:53:26 PM CDT
To: "Haggarty,David J" <DHAGGART@travelers.com>
Cc: Brett Evans <president@nationalcreditsolutions.net>, Jamie Watson <generalmanager@nationalcreditsolutions.net>, Jake Pipinich
    <Jakepipinich@holdenlitigation.com>
Bcc: "Lani A. Adler" <lani.adler@klgates.com>

1 Attachment, 283 KB

Dave,
I believe you are referencing section XI(11) of the policy endorsement which modifies III(a)(11) of the original contract. The section reads:

"The following replaces section III. EXCLUSIONS . A . 11..
11. by or on behalf of, or in the name or right of, any Insured, Client, or any entity:
a. owned, operated, or controlled by any Insured:
b. that owns, operates or controls any Insured; or
c. in which any Insured is a member of the board of directors, officer, member of the board of
managers, partner or principal stockholder,"

There is no dispute that a client is a non-covered entity. However, client is defined in section IV as "any recipient of Professional Services". As you are aware, NCS has never contracted with plaintiff Corliss Moore & Associates nor with First Lien Term Lenders Liquidating Trust for whom Corliss Moore acts as liquidating trustee. Further, NCS has never directly contracted with Hollywood Video or Movie Gallery. I have attached the original CCS-NCS contract for reference.

It is our position that coverage has been inaccurately declined based on the policy and nature of the complaint. Please contact me to discuss further.

I have carbon copied our outside local counsel specializing in insurance litigation.

Thank you,

Jason A. Sansone, MBA
General Counsel
National Credit Solutions
Cell: (405) 550-4564
Fax: (405) 619-3631
Jason@NationalCreditSolutions.net

National Cre__.pdf (283 K8)

On Apr 27, 2012, at 3:12 PM, Haggarty,David J wrote:

> Dear Jason,
>
> I have reviewed the Complaint and unfortunately the 2 claims against NCS are not covered. The claims are brought by what would be considered a client as defined in the policy (any recipient of professional services) and there is an exclusion for claims made against NCS by a client
>
> I will send a formal letter
>
> The Sands Anderson defense firm in Richmond, VA might be a good fit to defend you as they have experience in defending collection agencies
>
> Thank you
>
> David J Haggarty
> Sr. Claim Executive
> 888-882-4853
> 866-608-9632 - Fax
>
> <image001.gif>
>
> From: Jason Sansone [mailto:jason@nationalcreditsolutions.net]
> Sent: Tuesday, April 17, 2012 4:26 PM
> To: Haggarty,David J; Brett Evans; Jamie Watson, cmontoya@hinshawlaw.com; jweller@hinshawlaw.com
> Subject: Fwd: Corliss Moore & Associates v. National Credit Solutions, LLC
>
> A complaint has been filed by the HWVMG trustees against NCS and CCS. See attached. A claim for coverage in this matter is requested and a reconsideration of the prior request for coverage regarding CCS's Rule 2004 motion is requested. The matters are linked and any documentation produced to either CCS or the trustees will be discovered by the other party
>
> Jason A. Sansone
> Corporate Compliance Officer
> National Credit Solutions
> Cell: (405) 550-4564
> Fax: (405) 619-3631
> Jason@NationalCreditSolutions.net

From: "Williams, Jeremy S." <Jeremy.Williams@KutakRock.com>
Subject: Corliss Moore & Associates v. National Credit Solutions, LLC
Date: April 17, 2012 4:05:44 PM CDT
To: "jason@nationalcreditsolutions.net" <jason@nationalcreditsolutions.net>
Cc: "Adler, Lani A." <lani.adler@klgates.com>, "Bicks, John A." <John.Bicks@klgates.com>, "Condyles, Michael A." <Michael.Condyles@KutakRock.com>

Jason,
Please find attached a copy of the Complaint and related exhibits we just filed in the Eastern District of Virginia.  Once the summons is issued, we will send you the complaint and summons in hard copy.  Feel free to contact us with any questions.

Jeremy S. Williams
Kutak Rock LLP
Bank of America Center
1111 East Main Street, 8th Floor
Richmond, Virginia 23219
(804) 343-5257 (phone)
(804) 783-6192 (fax)

ANY FEDERAL TAX ADVICE CONTAINED IN THIS MESSAGE SHOULD NOT BE USED OR REFERRED TO IN THE PROMOTING, MARKETING OR RECOMMENDING OF ANY ENTITY, INVESTMENT PLAN OR ARRANGEMENT, AND SUCH ADVICE IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY A TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE

This E-mail message is confidential, is intended only for the named recipients above and may contain information that is privileged, attorney work product or otherwise protected by applicable law. If you have received this message in error, please notify the sender at 402-346-6000 and delete this E-mail message.
Thank you.

=========================================================================================

This communication, including attachments, is confidential, may be subject to legal privileges, and is intended for the sole use of the addressee. Any use, duplication, disclosure or dissemination of this communication, other than by the addressee, is prohibited. If you have received this communication in error, please notify the sender immediately and delete or destroy this communication and all copies.

# EXHIBIT H

From: "Haggarty,David J" <DHAGGART@travelers.com>
Subject: RE: Corliss Moore & Associates v. National Credit Solutions, LLC, et al. Claim #: T1206737
Date: May 2, 2012 3:41:32 PM CDT
To: "Jason Sansone" <jason@nationalcreditsolutions.net>
Cc: "Brett Evans" <president@nationalcreditsolutions.net>, "Jamie Watson" <generalmanager@nationalcreditsolutions.net>, "Jake Pipinich"
<Jakepipinich@holdenlitigation.com>

Dear Jason:

The Complaint contains numerous references to the plaintiff  administering/collecting the debts in question and which makes them the recipient of the professional services
provided by NCS.

Thank you.

Sincerely,

David J. Haggarty
Sr. Claim Executive
888-882-4853
866-608-9632 - Fax

-----Original Message-----
From: Jason Sansone [mailto:jason@nationalcreditsolutions.net]
Sent: Friday, April 27, 2012 5:53 PM
To: Haggarty,David J
Cc: Brett Evans; Jamie Watson; Jake Pipinich
Subject: Re: Corliss Moore & Associates v. National Credit Solutions, LLC, et al. Claim #: T1206737

Dave,
I believe you are referencing section XI(11) of the policy endorsement which modifies III(a)(11) of the original contract. The section reads:

*The following replaces section III. EXCLUSIONS , A., 11.:
11. by or on behalf of, or in the name or right of, any insured, Client, or any entity:
a. owned, operated, or controlled by any insured:
b. that owns, operates or controls any insured; or
c. in which any Insured is a member of the board of directors, officer, member of the board of
managers, partner or principal stockholder;"

There is no dispute that a client is a non-covered entity.  However, client is defined in section IV as "any recipient of Professional Services".  As you are aware, NCS has never
contracted with plaintiff Corliss Moore & Associates nor with First Lien Term Lenders Liquidating Trust for whom Corliss Moore acts as liquidating trustee.  Further, NCS has
never directly contracted with Hollywood Video or Movie Gallery.  I have attached the original CCS-NCS contract for reference.

It is our position that coverage has been inaccurately declined based on the policy and nature of the complaint.  Please contact me to discuss further.

I have carbon copied our outside local counsel specializing in insurance litigation.

Thank you,

Jason A. Sansone, MBA
General Counsel
National Credit Solutions
Cell: (405) 550-4564
Fax: (405) 619-3631
Jason@NationalCreditSolutions.net

===================================================================================
This communication, including attachments, is confidential, may be subject to legal privileges, and is intended for the sole use of the addressee. Any use, duplication,
disclosure or dissemination of this communication, other than by the addressee, is prohibited. If you have received this communication in error, please notify the sender
immediately and delete or destroy this communication and all copies.

NCS
P.O. Box 15779
Oke, OK 73155

Travelers Casualty Ins Comp.
One Tower Square
Hartford Ct
06183



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL

7009 0960 0000 6580 5841



U.S. POSTAGE
OKLAHOMA CITY, OK
MAY 09, 12
73155
$14.75
0005452-02